|! COOKS, Judge.
Defendants, John Quigg and the Premier Insurance Company of Massachusetts (Premier), appeal the trial court’s judgment awarding Edwin Keith Taylor and Billy Ray Cummings damages for injuries sustained in an automobile accident. We affirm.
BACKGROUND FACTS AND PROCEDURAL HISTORY
During the early morning hours of January 26, 1997, Taylor’s truck broke down on an elevated portion of Interstate 10 in St. John’s Parish, Louisiana. After pulling into the emergency lane, Taylor and his passenger (Cummings) began repairing the vehicle. Taylor was standing directly in front of the vehicle with his body bent over the engine compartment and Cummings was to his left holding a flashlight. The | ¡.truck’s hazard lights and headlights were on. The road was dry. While the two men were working, Quigg, driving a Hertz rental car, side-swiped the right side of Taylor’s truck. The impact caused the truck to strike both men causing them to fall. As a result of the accident, Taylor and Cummings suffered soft tissue injuries requiring several months of treatment.
Cummings and Taylor brought separate actions against Quigg and his liability insurer (Premier) seeking damages for injuries sustained in the accident. Eventually, these two suits were consolidated. Thereafter, Quigg and Premier filed a third party demand against The Hertz Corporation (Hertz) claiming Hertz’s failed to properly maintain the vehicle. Later, Taylor amended his petition asserting the same allegations of fault against Hertz.
After trial, the court found Quigg solely at fault for causing the accident. Taylor was awarded $27,500.00 in general damages, $6,761.11 in medical expenses, and $12,269.15 in lost wages. Additionally, Taylor’s wife was awarded $3,500.00 for loss of consortium, services, and society. Cummings was awarded $18,000.00 in general damages, $2,768.16 for past medical bills, and $9,200.00 in lost wages. Quigg and Premier now appeal this ruling.
ASSIGNMENTS OF ERROR
Quigg and Premier now assign the following errors for our review:
1. The trial court erred in finding that John Quigg was at fault in causing the accident based on inadmissible opinion testimony.
2. The trial court erred in awarding Edwin Keith Taylor past lost wages for five months.
3. The trial court erred in awarding excessive general damages of $27,500.00 to Edwin Keith Taylor.
4. The trial court erred in failing to offset the award for lost wages and medical expenses up to the amount of workers’ compensation benefits received by Edwin Keith Taylor.
|35. The trial court erred in awarding Billy Cummings general damages in the amount of $18,000.00.
*38 LAW AND ANALYSIS
Apportionment of Fault
Quigg and Premier assert the trial court erred in finding Quigg at fault for causing the accident. They argue the accident resulted from a defective tire, negligently overlooked by Hertz, which suddenly and without warning, blew out as Quigg was approaching Taylor’s truck.
Quigg testified he was driving in a safe and prudent manner before the accident. Quigg also stated he was awake, alert, and had not been drinking. About twenty (20) yards away from Taylor’s truck, Quigg claimed he heard a loud popping noise from the front of the car and immediately afterwards the car began to veer sharply out of its lane to the right.- According to Quigg:
I assumed the tire had blown out. I heard the pop, and I lost total control of the vehicle, the front end. I mean, I could tell where I lost control of the vehicle because the whole right side just kind of dropped and it veered to the right. I personally either know it was either a blowout or I had lost the tire, one of the two, they way the car acted. It just careened to the right, and the tire, you could hear the pop.
After losing control of the vehicle, Quigg refused to hit the brakes believing, “once you car goes into a skid or any type of, you lose control, the worst possible thing to do is to hit your brake, only because it will cause you to spin.” The vehicle came to a halt only after colliding with Taylor’s truck and then traveling an additional quarter of a mile.
Ordinarily, in a personal injury case, the plaintiff bears the burden of proving the existence of injuries and the casual connection between them and the accident. Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95); 650 So.2d 742; Guillory v. Insurance Co. of North America, 95-1500 (La.App. 3 Cir. 4/3/96); 671 So.2d 1112. LHowever, when a defendant motorist leaves his own lane and strikes another vehicle the plaintiff is entitled to a presumption of the defendant’s negligence. Ferrell, 650 So.2d 742. “In such a case, the burden of proof on such defendant motorist is to show that he was not guilty of any dereliction, however slight.” Ferrell, 650 So.2d at 746 citing Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Simon v. Ford Motor Co., 282 So.2d 126 (La.1973); Rizley v. Cutrer, 232 La. 655, 95 So.2d 139 (1957). This burden of proof is imposed because, “it seems only reasonable ... that a motorist owes ... the duty of remaining in his own lane.... ” Ferrell, 650 So.2d at 746, citing Rizley, 95 So.2d at 142. Moreover, where the accident is attributed to a vehicle’s latent defect, the person claiming such a latent defect defense is required to come forward with objective and convincing evidence, other than his own testimony, against which his “degree of innocence of fault” can be measured. Ferrell, 650 So.2d at 747, citing King v. Louviere, 543 So.2d 1327 (La.1989); Simon v. Ford Motor Co., 282 So.2d 126 (La.1973).
Though Quigg insists a tire blow out was the cause of the accident, the evidence suggests otherwise. It was the collision with Taylor’s truck which caused the right front tire of Quigg’s vehicle to flatten. After the accident the tire was examined by Quigg, Taylor, and Cummings. All three described the damage as a “cut” in the tire’s sidewall. The sidewall is the area between the rim of the tire and the tread. When questioned about the damage Quigg testified:
A: It was on the — if you were looking at the vehicle, you were standing in front of the side of the vehicle on the passenger’s side, if you were to bend down and put yourself right in front of the tire, it would be right in front of you, right in the middle of the tire.
Q: Would it be on the treads?
A: Uh-
Q: You understand what the treads are?
*39 | sA: The, the part that touches the road?
Q: Yes.
A: No, sir, it was not.
Q: Was it in the side of the tire, what we call a sidewall?
A: It was between the rim of the tire and the tread.
Q: All right. That’s what -
A: Yeah.
Q: we call the sidewall.
Importantly, Quigg’s front tire collided with Taylor’s truck. Specifically, the tire struck and peeled away the truck’s left front bumper. According to Taylor, “the front bumper was tore loose on it, on the driver’s side, hanging down to the pavement.” The bumper’s edge is jagged and “C” shaped. This disfigurement is consistent with the cut in the sidewall of Quigg’s right front tire identified by Quigg, Taylor and Cummings immediately after the accident. Thus, the trial court concluded because the only damage to the tire was the cut, it was reasonable to find the tire was punctured and flattened during the collision, not beforehand.
Quigg produces no objective evidence contradicting this conclusion. As support for his claim that the tire blew out prior to the accident, Quigg relies solely on his self-serving testimony that he heard a loud “pop” just before losing control of the vehicle. According to Quigg the “pop” and the gash occurred instantaneously. When questioned as to why he believes the gash is a manifestation of the “pop” Quigg stated:
Basically, because of the — -if you’re driving the vehicle and you’re in the vehicle, you hear a noise and the ear drops and veers to the right, it can only be one thing. There is nothing else it can be. I’m not a mechanic, but I mean, you’ve got to know it’s the front passenger’s side tire, you have to know it. You have to know it. I mean, if you were in the vehicle driving, you know, there’s only one, there’s only one conclusion you can come up and that’s the tire. That’s the first thing that you check is the tire. I mean, the way the | ¿vehicle dropped, the pop, the drop, and then, it just veered to the right uncontrollably.
Quigg claims the tire blew out within yards of Taylor’s truck. However, though traffic was light to moderate and they were standing outside of the truck, Taylor and Cummings testified they did not hear the alleged “pop.” Moreover, Trooper Roy In-golia, who investigated the accident testified he did not find any physical evidence to support Quigg’s notion that his right tire blew out prior to colliding with Taylor’s truck. Trooper Ingolia testified it was impossible for him to say whether Quigg’s tire blew out before the collision, or during the impact. However, he testified, based on his eighteen years experience as a road trooper, when a tire blows out at the speed Quigg was traveling “its going to be pretty well shredded” leaving tire debris in the roadway.
Additionally, Ed Wellman, an ASC master technician since 1977, testified a defective tire would caused a noticeable change in the vehicle’s operation. Quigg drove the car 635 miles between the time it was rented and the time the accident occurred. During this time, Quigg maintains he never noticed any problems with any of the vehicle’s tires or any difference in the handing of the vehicle prior to the accident.
Quigg failed to produce any objective evidence the accident resulted from a tire blowout. Quigg has, thus, failed to discharge his burden of proof absolving himself from liability. The trial court did not err in finding Quigg at fault for the accident.
Taylor’s Lost Wages
By their second assignment of error, Quigg and Premier assert the trial court erroneously awarded Taylor lost wages in the amount of $12,269.15. Appellants argue the amount awarded is excessive because it was not proven, with a *40 reasonable degree of certainty, that Taylor would have drawn a salary every month during the five month | ^period had he been able to work. Taylor is employed as a boilermaker, working a specific job for weeks or months at a time. After completing a job, Taylor, in accordance with H.B. Zachry Company (Zachry) procedures, is given a “reduction in force” slip. This document informs Taylor that his work at a particular job site has ended. He then awaits recall to another job site somewhere in the United States. The down time between job varies, “sometimes it is short and sometimes it is long.” At the time of the accident Taylor was working at a Zachry job site near Luling, Louisiana. This job ended and Taylor received his “reduction in force” slip on March 26, 1997. Taylor was not recalled until July 14, 1997 when he began work at a job site in Natchez, Mississippi. There were no available jobs identified for Taylor in the interim.’ Therefore, appellants argue, Taylor is not entitled to lost wages from March 27, 1997 until his return to work on July 14,1997.
Appellants aver Taylor is entitled only to those wages which he can precisely prove were lost as a result of his inability to work. Thus, they argue, to recover lost wages for the entire time of his convalescence, Taylor had to prove there was work available in the interim between the completion of the Luling job and the start of the Natchez job. Appellants assertion is based on a misunderstanding of the method utilized to calculate an award of lost wages. Lost wages “need not be precisely proven, they must be shown with reasonable certainty.” Richard v. Wal-Mart Stores, Inc., 29,926 p. 11 (La.App. 2 Cir. 10/31/97); 702 So.2d 79, 89, writs denied, 709 So.2d 744 (La.1998), citing, Carter v. Brookshire Grocery Co., 29,166 (La.App. 2 Cir. 2/26/97); 690 So.2d 933; Moore v. Chrysler Corporation, 596 So.2d 225 (La.App. 2 Cir.1992), writs denied, 599 So.2d 316, 317 (La.1992); Finley v. Bass, 478 So.2d 608 (La.App. 2 Cir.1985). Proof may consist of the plaintiffs credible testimony alone. Veazey v. State Farm Mutual Auto Insurance, 587 So.2d 5 (La.App. 3 Cir.1991). An award for lost past wages can be “computed on the amount the 1 ¡¡plaintiff would have in all probability” earned had he been able to work. Richard, 702 So.2d at 79. Factors to be considered in determining a proper award for lost past income are the plaintiffs physical condition before the injury, the plaintiffs work history, work consistency, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages for the remainder of his work life. Smith v. Two “R” Drilling Company, Inc., 606 So.2d 804 (La.App. 4 Cir.), writ denied, 607 So.2d 560 (La.1992).
Following the accident, Taylor was unable to work for a five month period (from the date of the accident until July 1, 1997) when he was released by his treating physician to return to work. The year prior to the accident Taylor earned $29,446.00. This calculates to an average monthly income of $2,453.83. Had Taylor been able to work during those five months of convalescence he could have earned wages working for Zachry Margaret Castille, Za-chry’s business manager, testified Taylor enjoyed a “long standing employment” and that he has “been one of the more valued employees and loyal with his work.” If there were no jobs available from Za-chry in the interim between the closure of the Luling job and the start of the Natchez job, Taylor would have earned wages working for another company. Taylor testified:
Q: Okay. When you say “off and on,” what do you mean by that?
A: We work jobs, and then, you’re IOF until the next job, and you may work a year on one, or you may work six months, and you may have a break in employment, and you work for another company awhile, and then, come back. They’re international, but I’ve been more or less permanent though for eight *41 years, but there is a break in work occasionally, and we’ll work for another company until another job comes up.
It is reasonable to assume, but for his injury, Taylor would have earned the same monthly wage in 1997 as he earned in 1996. The trial judge did not abuse her discretion in finding Taylor “suffered lost wages of $2,453.83 each month for five | flmonths for a total of $12,619.15.”
General Damages
In their third and fifth assignment of errors, Quigg and Premier complain the amount of general damages awarded Taylor and Cummings was excessive.
“General damages” are those which cannot be fixed with pecuniary exactitude; they involve mental or physical pain or suffering, inconvenience, loss of intellectual gratification, or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Montgomery v. Opelousas General Hospital, 546 So.2d 621 (La.App. 3 Cir.), unit denied, 551 So.2d 630 (La.1989). In reviewing general damage awards, an appellate court must accord much deference to the trial judge or jury. Andrus v. State Farm Mutual Automobile Insurance Company, 95-0801 (La.3/22/96), 670 So.2d 1206. The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Id.; Reck v. Stevens, 373 So.2d 498 (La.1979). Because the discretion vested in the trial court is great, and even vast, an appellate court should only disturb an award of damages if there is clear abuse of that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Edwin Keith Taylor
The trial judge awarded Taylor $27,500.00 in general damages for his “pain and suffering, mental anguish, worry and anxiety.” The trial court’s findings of fact concerning Taylor’s injuries are as follows:
Keith Taylor was knocked down by the impact of the 1996 Ford Contour driven by Mr. Quigg. He testified that the bumper of his pickup struck his right knee and the grill hit him in the chest. He did not go to a medical facility on the date of the accident, but awoke the next day, January 27, 1997 with a swollen right knee which throbbed from pain. Mr.Taylor’s wife drove him to Riverland Medical |inCenter where he was examined in the emergency room. An x-ray was taken of his knee that day. Mr. Taylor was given a knee immobilizer, was told to use crutches and was prescribed Motrin to be taken every six hours. He was also told to use ice packs the first twenty four hours and then to use warm packs to help relieve swelling and pain.
Dr. Moak was listed by Taylor as his treating physician at the emergency room and reviewed the emergency records of January 27, 1997 prior to his deposition, but did not see Mr. Taylor as a result of the accident. Dr. Moak did note that Mr. Taylor had been in an automobile accident the first part of December, 1996 and he had examined Mr. Taylor on December 16, 1996. In that particular accident Mr. Taylor suffered a bruised sternum as a result of the accident but had no complaints of neck pain, back pain or shoulder pain concerning the accident in December, 1996.
Mr. Taylor consulted Dr. Robert Van Uden, an orthopedic physician, on January 30, 1997. On that date Mr. Taylor related the fact that he was knocked down by his vehicle after it was struck by another vehicle. Mr. Taylor reported he had been examined at Riverland Medical Center and was on crutches with his knee in an immobilizer on January 30. Mr. Taylor complained of severe low back pain and had considerable swelling over his right knee with fluid on *42 his knee. His knee was also bruised in the front and on the lateral side. There was also a spasm over Mr. Taylor’s lubmbosacral spine. Dr. Van Uden prescribed physical therapy and anti-inflammatory medication, Lodine. Dr. Van Uden diagnosed Mr. Taylor on that date with a hemarthrosis of the right knee or blood within the right knee joint, which arose because of an injury to the ligament or cartilages or menisci of the right knee. Also, Mr. Taylor was diagnosed with a lumbosacral strain or injury to the muscles and ligaments of his back.
Mr. Taylor saw Dr. Van Uden again February 7, 1997 with an improvement in his lower back. However, his knee was very swollen and he was suffering discomfort in his knee. An MRI of the knee was recommended by Dr. Van Uden. After the MRI was conducted, Mr. Taylor was seen on February 11 by Van Uden. At that time Dr. Van Uden noted there was no damage to any of the major ligaments, the cartilages or the menisci but there was some ligamentous damage. Mr. Taylor’s complaints on that date were knee and low back pain. On February 21, Mr. Taylor was again seen by Dr. Van Uden. He complained of back pain, neck pain, right shoulder pain and headaches. His knee was not swollen as it had been earlier. A muscle | nrelaxant, Flexeril, was prescribed and Mr. Taylor was told to continue his physical therapy. On March 19 Mr. Taylor returned to Dr. Van Uden. The swelling in his knee had nearly gone but Mr. Taylor continued to suffer pain in the area in front of his kneecap and around his kneecap was weak. He- also complained of neck and right shoulder pain. An examination revealed restriction of motion in the neck and shoulder area. On April 9, 1997 Mr. Taylor reported to Dr. Van Uden that he was having low back pain, neck pain and shoulder pain. He also complained of numbness in his right fingers and had loss of grip in his right hand. Dr. Van Uden suggested an MRI of Mr. Taylor’s necks [sic], shoulder and back which was performed on April 23, 1997. The MRI of the lumbar spine revealed bulging of some of the discs in the lower back, but no herniation. The MRI of the shoulder revealed no damage to that area and the MRI of the neck indicated a small spur at cervical vertebra Number 4. On May 21, 1997 Mr. Taylor was again seen by Dr. Van Uden. On that date a knee examination was nearly normal and there was less numbness and fewer symptoms in the shoulder and the neck. On June 11, 1997 Mr. Taylor was seen by Dr. Van Uden and his knee had improved. Mr. Taylor complained of only occasional pain in his right shoulder. Dr. Van Uden released Mr. Taylor to work on July 1, 1997; and testified Mr. Taylor was unable to work from January 30, 1997 through July 1, 1997. Dr. Van Uden’s diagnosis on discharge of Mr. Taylor was lumbar strain, hemar-throsis and cervical strain with some radicular type symptoms. Dr. Van Uden was also of the opinion that the arthritis in Mr. Taylor’s back could have been aggravated by the accident.
Following the accident Mr. Taylor suffered significant pain to his knee, back, neck, and right shoulder. Even subsequent to July 1 when Mr. Taylor was released to return to work, Mr. Taylor continued to suffer pain. In addition to the inability to work, the pain caused Mr. Taylor to suffer mood swings. Mr. Taylor’s inability to earn income for five months resulted in Mr. & Mrs. Taylor being unable to maintain their monthly payments on their home. The couple lost their home as a result of a foreclosure. These problems caused the Tay-lors to suffer marital discord to the point of contemplating divorce.
Taking into account the extent of Taylor’s numerous injuries, the duration of his recovery, and the mental anguish he suffered as a result of the accident, we find the amount awarded by the trial court well *43 within the amount a reasonable trier of fact could assess under the circumstances of the case. The trial court’s award of 11;,$27,500.00 to Taylor in general damages was not an abuse of discretion.
Billy Cummings
The trial court awarded Cummings $18,000.00 in general damages. Cummings testified the force of the collision propelled his body into the bridge’s concrete guard rail. Though in pain, Cummings did not seek medical attention until the day after the accident. On January 27, 1997, Cummings went to the Natchez Regional Medical Center complaining of pain in his shoulder, neck and back. He was diagnosed with contusions to the thoracic spine and muscle strains in the lum-bosacral spine. To alleviate the pain, the attending physician prescribed Toradol and Tylenol; and instructed Cummings to use a heating pad on his back thrice daily.
Despite the emergency room visit, Cummings continued to ail and as a result on February 3, 1997, he sought treatment from Dr. Van Uden. Again, Cummings complained of pain in his shoulder, neck and back. Dr. Van Uden opined Cummings “had sustained a cervical—’that is the neck—and a lumbosacral—that is the low back—strain sort of an injury, which is an injury to some of the muscles and the ligaments in these areas.” Dr. Van Uden prescribed analgesics and muscle relaxers for Cummings, as well as physical therapy. He was also restricted from working. Cummings treatment lasted five months until June 19,1997, when Dr. Van Uden released him to return to work. Dr. Van Uden released Cummings for work without restrictions, but noted there were mild degenerative changes in his back. This impairment plagues Cummings. He testified back problems diminishes his effectiveness as a welder/pipe-fitter. Cummings stated: “ ... I have to get help to do things at work now that I normally didn’t have to do.” After considering the evidence, we cannot say the trial court abused its discretion in awarding Cummings $18,000.00 in general damages.
l13Offset
Following the accident, Taylor filed a claim for workers’ compensation benefits against Zaehry and its workers’ compensation carrier Insurance Company of North America. On April 15, 1998 the parties agreed, as a settlement condition, that Taylor would dismiss “all claims or rights or actions” against Zaehry and the Insurance Company of North America for $10,000.00. The settlement agreement, in pertinent part, reads:
Subject to the approval of the Office of Workers’ Compensation, petitioners have agreed upon a compromise settlement of their dispute by the payment to the employee the full sum of TEN THOUSAND AND NO/100 ($10,000.00) DOLLARS, plus a waiver of any intervention rights which they may possess in the civil suit filed by claimant as a result of injuries sustained in the accident made the subject matter of the claim. Said compromise and settlement of all claims which the employee may have against employer and insurer, including but not limited to any claims for penalties and attorney’s fees.
* * *
Petitioners hereby state that it is agreed and understood that the acceptance of the above sum of money is in full accord and satisfaction of any and all claims and demands against employer that arose from any injury/condition/disability occurring as a result of said incident/injury.
Quigg and Premier contend the amount of lost wages and medical expenses awarded to Taylor by the trial court should have been offset by the amount he received in settlement.
The “collateral source” rule holds that a tortfeasor may not benefit, and an injured plaintiffs tort recovery may not be diminished, because of benefits received by *44 the plaintiff from sources independent of the tortfeasor’s procuration or contribution. Kidder v. Boudreaux, 93-859 (La.App. 3 Cir. 4/6/94); 636 So.2d 282; Williamson v. St. Francis Medical Center, 559 So.2d 929 (La.App. 2 Cir.1990); Brannon v. Shelter Mut. Ins. Co., 520 So.2d 984 (La.App. 3 Cir.1987); Doerle v. State Through Dept. of Highways, 147 So.2d 776 (La.App. 3 Cir.1962). In Lee v. Cook, 482 So.2d 760, 763 (La.App. 5 Cir.), writ denied, 484 So.2d 137 (La.1986), our brethren in the fifth circuit held:
Under the collateral source rule in an action by an injured employee against a third-party tortfeasor, where the tort-feasor is established and the employer does not intervene for reimbursement of compensation benefits paid, the plaintiff is entitled to recover the full amount of damages sustained by him without deduction of the amounts he has received from his employer as compensation benefits. (Citations omitted).
“Only payments made by the tortfeasor are entitled to consideration in order that the tortfeasor may be granted a credit.” (Emphasis ours). Dumas v. Harry, 94-19 (La.App. 5 Cir. 5/11/94); 638 So.2d 283. Here, the only payment made to Taylor was $10,000.00 by Zachry and the Insurance Company of North America. This payment was not made on behalf or for the benefit of Quigg and Premier; thus, they are not entitled to benefit from the payment. The trial court did not err in failing to offset Taylor’s award of lost wages and medical expenses by the amount he received in settlement with his employer and its workers’ compensation carrier.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs are assessed against defendants-appellants.
AFFIRMED.