772 So.2d 749 (2000)
Mr. and Mrs. Kenneth RAUCH
v.
Dr. Frank SCHIAVI and St. Paul Fire and Marine Insurance Company.
No. 00-CA-160.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 2000.
*751 Ambrose K. Ramsey, III, Law Offices of Robert E. Birtel, Metairie, Louisiana, Attorneys for Defendant/Appellant, St. Paul Fire & Marine Insurance Company.
George J. Nalley, Jr, Metairie, Louisiana, Attorney for Defendant/Appellant, Dr. Frank Schiavi.
Joel P. Loeffelholz, New Orleans, Louisiana, William W. Hall, Metairie, Louisiana, Attorneys for Appellees.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and SUSAN M. CHEHARDY.
DALEY, Judge.
The defendants, in this medical malpractice action, have appealed a judgment rendered in favor of plaintiff following a judge trial. For reasons which follow, we affirm in part, reverse in part, and amend in part.

FACTS:
The plaintiff, Kenneth Rauch, suffered a fractured left femur in a work-related accident in 1985. He sought treatment from the defendant, Dr. Frank Schiavi. Surgery was preformed to insert a compression plate into Mr. Rauch's thigh. Several years later, Mr. Rauch began to experience pain over the plate. The plate was removed by Dr. Schiavi on March 2, 1993. On April 29, 1993, Mr. Rauch was instructed by Dr. Schiavi's to return to work "light duty." He was instructed to return to regular duty work one month later.
Mr. Rauch returned to work as instructed on May 3, 1993. He also worked May 4th, and 5th. On May 6, 1993, Mr. Rauch contacted another physician to evaluate the pain he was experiencing in his left thigh. Mr. Rauch was examined by Dr. Raymond Horn on May 7, 1993. Dr. Horn noted Mr. Rauch had weakness and atrophy in this left thigh, and recommended Mr. Rauch not work at all at the present time. Dr. Horn further recommended Mr. Rauch attend physical therapy, and use "crutch support."
On the evening of May 7, 1993, Mr. Rauch attended his daughter's wedding. He walked his daughter down the aisle, and as he turned after leaving her at the altar, he felt his thigh "snap", and fell to the floor. Medical help was summoned, and he was taken to the hospital where it was determined that he sustained a fracture of the left femur at the sight where the plate had been removed. Further surgery was carried out, and a metal rod was placed into Mr. Rauch's thigh. This rod was subsequently removed.
Mr. Rauch and his wife filed suit against Dr. Schiavi and his insurer, St. Paul Fire and Marine Insurance Company, alleging Dr. Schiavi was negligent in his treatment of Mr. Rauch, which resulted in the second fracture. Following trial, the judge ruled in favor of plaintiffs. Dr. Schiavi and St. *752 Paul, (hereinafter referred to collectively as appellant), have appealed this judgment.

DISCUSSION:
On appeal, Dr. Schiavi argues the trial court erred in finding medical malpractice on the part of Dr. Schiavi in the absence of expert testimony establishing malpractice was committed. Dr. Schiavi contends no expert testified that Dr. Schiavi breached the standard of care with respect to his treatment of Mr. Rauch, or that any of Dr. Schiavi's actions caused the refracture.
Dr. Schiavi contends he was not negligent in his treatment of Mr. Rauch and further, plaintiff was injured through his own fault in that he returned to work and performed work, which was not light duty, and beared weight on his leg while walking his daughter down the aisle after he was instructed by Dr. Horn to walk with crutches.
Mr. Rauch contends that Dr. Schiavi erred in the following ways: (1) failure to prescribe physical therapy after the plate removal to strengthen the thigh muscles; (2) failure to examine the plaintiff on a frequent basis following the plate removal; and (3) releasing the plaintiff to return to work too early.
At trial, Mr. Rauch testified that following the removal of the plate he was examined by Dr. Schiavi on three occasions, and physical therapy was never discussed by him during these visits. Mr. Rauch testified that on the first post operative visit of March 11, 1993, the staples were removed from the incision, he was still walking on crutches, and had a lot of pain. He returned to Dr. Schiavi's office as instructed on April 1, 1993. Dr. Schiavi examined his legs, gave him a prescription for pain medication. When he returned to Dr. Schiavi's office on April 29, 1993, he was instructed by Dr. Schiavi to return to work "light duty." Mr. Rauch testified that he explained to Dr. Schiavi there was no such thing as light duty at Boh Brothers and further, that light duty consisted of being placed in the tool room and handing out tools. This involved climbing, bending and stooping. He further testified that he begged Dr. Schiavi not to send him back to work because he still had a lot of pain in his leg, he was still walking with a limp, and "the leg was not ready." Mr. Rauch testified that Dr. Schiavi told him his leg was sufficiently healed to allow him to go back to work. Dr. Schiavi did not prescribe crutches.
Mr. Rauch testified that he returned to work on May 3rd, 4th, and 5th. On May 6, he experienced such severe pain he could not work. He explained that he wanted a second opinion about his leg, so he sought treatment from Dr. Horn. Dr. Horn took an x-ray, measured the girth of his thighs, and gave Mr. Rauch a slip stating he could not return to work until further notice. Dr. Horn instructed him to walk with crutches, and to attend physical therapy.
On the evening of May 6th, after he had been examined by Dr. Horn, Mr. Rauch testified that he went to the church for his daughter's wedding. He did not want the crutches in the pictures, so he did not use them to walk his daughter down the aisle. After he left his daughter at the altar, he turned to walk to the pew. At this point he felt a snap in his leg and fell to the ground. He was taken to the hospital and treated for a fractured femur. He was unable to attend his daughter's wedding reception.
Mr. Rauch testified that he underwent surgery by Dr. Parnell who inserted a rod into his leg. The rod was removed twenty months later. Mr. Rauch testified that he continues to suffer from pain in his leg, and is unable to participate in many activities he enjoyed prior to the second fracture.
Mrs. Rauch's testimony corroborated that of her husband. She attended all post operative visits to Dr. Schiavi's office.
Dr. Schiavi testified as to his prior treatment of Mr. Rauch in 1985 when the plate was inserted. He explained that the plate was removed due to pain experienced by *753 Mr. Rauch over the plate. Dr. Schiavi denied that Mr. Rauch complained of severe pain on the April 1st and 29th visits. Rather, Dr. Schiavi testified that Mr. Rauch complained of only occasional and slight pain, as recorded in his office records. Dr. Schiavi further testified that he told the plaintiff he could send him to physical therapy. Dr. Schiavi explained that plaintiff stated he knew how to do the exercises since he attended physical therapy after his first surgery, and that plaintiff agreed to perform the exercises at home.
Dr. Schiavi explained that if a person is limping because of muscle weakness, there is extra stress on the bone. He further testified that on the April 29th visit, Mr. Rauch was able to arise from a sitting position out of a chair to a standing position. He explained that if Mr. Rauch did not have adequate strength in his thigh muscles, he would have been unable to arise from the chair. Mrs. Rauch's testimony that, Mr. Rauch did not sit in, or arise from a sitting position out of a chair to a standing position in Dr. Schiavi's presence suggests that Dr. Schiavi's recollection of the events was inaccurate.
Dr. Schiavi testified that he wrote a letter to plaintiffs employer's workers' compensation insurance carrier dated March 18, 1993. This letter states that Mr. Rauch must be careful over the next six to eight weeks to give the bone a chance to get used to being without the plate, and that Mr. Rauch could perform no heavy labor during this time. Dr. Schiavi testified that a copy of this letter was not sent to Mr. Rauch, however, he explained to the plaintiff during the March 11th visit that he would have to limit his activities to light duty. Dr. Schiavi acknowledged that there is no reference to the letter, or caution regarding placing undue stress on the bone in his office notes. However, Dr. Schiavi testified that when Mr. Rauch signed the consent for surgery to have the plate removed, he informed plaintiff he would not be able to put "regular" stress on his bone for three months. Dr. Schiavi explained that by not releasing plaintiff to full duty until three months after the surgery, he felt he adequately protected the bone from undue stress.
Dr. Schiavi denied that Mr. Rauch told him there was no such thing as light duty at Boh Brothers. Rather, Dr. Schiavi testified that following Mr. Rauch's 1985 surgery, he explained to Mr. Rauch that light duty meant sitting at a desk answering a telephone. This is the type of work Dr. Schiavi expected plaintiff to perform when he was released to return to light duty work on April 29, 1993. Dr. Schiavi testified that in a worker's compensation case, he always wants to give the patient the option of performing light duty work. Dr. Schiavi explained that in a worker's compensation case, he, as the physician, has the responsibility to the patient, and the company to get the patient back to his normal activities. He further explained that if he listened to every patient who told him there was no light duty at their place of employment, he would never send anyone back to work. Finally, Dr. Schiavi testified that if plaintiff had told him that light duty work at Boh Brothers consisted of working in the tool room which entails bending, stooping, and climbing, he would not have released plaintiff to return to work on April 29, 1993.
Dr. Schiavi also testified that had he seen what Dr. Horn recorded when he examined Mr. Rauch's leg on May 7, 1993, he would not have recommended Mr. Rauch return to work. Dr. Schiavi did not dispute Dr. Horn's findings; rather, he thought it was possible that plaintiff suffered a stress fracture after he returned to work.
S. Daniel Seltzer, M. D., a board-certified orthopedist, was called to the stand by plaintiff. Dr. Seltzer testified that he served on the medical review panel in this case, which concluded there was no breach of the standard of care by Dr. Schiavi. Dr. Seltzer explained that the medical literature reports the incidence of refracture *754 following plate removal ranges from 1-15%. The majority of refractures will occur through one of the screw holes. He explained that the strength of the muscles over the bone is important in terms of taking stress off the bone. When there is more stress on the bone, the likelihood of a fracture is increased. Physical therapy is prescribed following this type surgery to increase the muscle strength and take stress off the bone.
Dr. Seltzer testified that there is no set time when a patient can resume bearing weight on the leg following plate removal; this is determined by the physician's clinical judgment. Dr. Seltzer also testified that how often he examines patients after this type surgery depends on how the patient's recovery is progressing.
Dr. Seltzer testified that the fact that there was a fracture following the plate removal does not in and of itself indicate there was a breach of the standard of care. Dr. Seltzer stated that a hairline fracture would not be visible on an ordinary x-ray. Whether or not further testing such as an MRI or bone scan is ordered depends on how the patient is progressing. With regard to Dr. Horn's findings, Dr. Seltzer testified that the marked weakness, and significant atrophy took some time to develop, and did not occur during the five days prior to the visit by Mr. Rauch to Dr. Horn on May 7, 1993, indicating that a problem with the leg would have been visible prior to Dr. Schiavi's releasing Mr. Rauch for light duty.
Melvin Parnell, Jr., M.D., a board-certified orthopedist, testified that he first examined Mr. Rauch on May 8, 1993. X-rays indicated Mr. Rauch had sustained a fracture through the distal third of the femur, through one of the screw holes from the previous surgery. He explained that a rod was placed in the femur which extended from the hip to the knee. Twenty months later the rod was removed. Mr. Rauch remains under Dr. Parnell's care.
Dr. Parnell explained that stress fractures and hairline fractures are not uncommon after plate removal. These conditions are not visible on plain x-rays and if there is continued pain and limping an MRI and bone scan are needed. Dr. Parnell generally sees patients every two weeks following plate removal surgery.
Dr. Parnell testified that the marked weakness noted by Dr. Horn did not occur during the six days prior to the visit, explaining that this condition took some time to develop. He would have expected this condition to have been present when Dr. Schiavi last examined Mr. Rauch on April 29, 1993. Dr. Parnell further testified that if he had examined Mr. Rauch on April 29, 1993, and found marked weakness, significant atrophy, a limp, and severe pain, he would not have sent Mr. Rauch back to work. Further, had Dr. Parnell felt Mr. Rauch was capable of light duty, he would have specified exactly what activities he could and could not perform. Dr. Parnell testified that he would have expected another physician to do the same.
The deposition of Dr. Horn was introduced into evidence. Dr. Horn testified that in his practice, he recommends physical therapy after plate removal. He further testified that if he had a patient who continued to complain of pain eight weeks following plate removal, he would not send that patient back to work. Dr. Horn explained that in the letter he wrote to plaintiffs employer, he described the atrophy as significant, which is measurable but not incapacitating.
The deposition of Dr. Wilmot Ploger was also introduced into evidence. Dr. Ploger, a board-certified orthopedist, who has known Dr. Schiavi for 15 years, served on the medical review panel. Dr. Ploger opined that on April 29, 1993, there was sufficient healing of the bone to allow Mr. Rauch to walk on his leg. Dr. Ploger testified that he does not prescribe physical therapy for every patient who has a plate removed. He stated that there is no set time period for how often a patient should be examined following this type *755 surgery, however, he would expect to see this type patient every "couple of weeks." He would not consider it to be below the standard of care to see a patient less frequently. Dr. Ploger stated that he would not expect to see measurements of a patient's thigh girth following this type of surgery because as a physician you can "just look at it and determine in your own mind" whether there is atrophy.
Dr. Ploger further testified that a patient's complaints of pain do not necessarily mean there is a problem with healing of the bone. However, with a patient who is eight weeks post operative plate removal, and still complaining of significant pain, he would order an x-ray, blood work, MRI, and tomography. Dr. Ploger explained that part of the standard of care is to find out why there are still complaints of pain. He explained that the screw holes, which remain after plate removal weakens the bone.

PLAINTIFF'S BURDEN OF PROOF:
The plaintiff's burden of proof in a medical malpractice action is set forth in LSA-R.S. 9:2794 A which provides that a plaintiff must prove: (1) the appropriate standard of care ordinarily practiced by physicians under similar circumstance, (2)that the defendant lacked the requisite degree of skill or knowledge, or failed to use reasonable care in the treatment of plaintiff, and (3) that defendant's failure or lack of skill and knowledge was the proximate cause of plaintiff's injury.
Our first inquiry is whether the plaintiff proved by a preponderance of the evidence that the defendant's treatment of plaintiff fell below the ordinary standard of care.
The experts testified that frequency of postoperative office visits, whether or not physical therapy is prescribed, when the patient should return to work, and whether further diagnostic testing should be ordered depends on the patient's progress. They testified that if the patient continues to complain of severe pain, and is limping six to eight weeks following plate removal surgery, further testing should be performed. All of the experts testified that they would have prescribed physical therapy for a patient such as Mr. Rauch. The experts further testified that they would have seen a patient such as Mr. Rauch every two weeks following surgery. Most importantly, all of the experts testified that if Mr. Rauch had complained of severe pain on the April 29, 1993 visit, they would not have released him to return to work.
While Dr. Schiavi testified Mr. Rauch was not complaining of significant pain on the April 29, 1993 visit, Mr. and Mrs. Rauch testified that Mr. Rauch complained of severe pain. Mr. Rauch testified that he told Dr. Schiavi his leg was not sufficiently healed to return to work, and there was no light duty work at Boh Brothers. Dr. Schiavi testified that had Mr. Rauch complained of severe pain, and had significant muscle atrophy he would not have returned him to work, and he would have treated him differently. Thus, whether Dr. Schiavi breached the standard of care during his post operative treatment of plaintiff depends on what actually occurred during the post operative visits. The trial judge obviously determined Mr. and Mrs. Rauch's testimony was more credible than that of Dr. Schiavi, and found Dr. Schiavi breached the standard of care. While no physician testified that Dr. Schiavi breached the standard of care, each physician, including Dr. Schiavi, testified that different care was warranted if the patient's complaints were those indicated in Mr. and Ms. Rauch's trial testimony.
The jurisprudence requires that we affirm the trial court's findings of fact if these findings are reasonable when the record is reviewed in its entirety; if the findings of fact are supported by the record, an appellate court may not reverse even if they are convinced they would have weighed the evidence differently had they been sitting as trier of fact. Martin v. East Jefferson General Hospital, 582 So.2d 1272, (La.1991). When there are *756 two permissible views of the evidence, the fact finder's view cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
We find the trial judge's inferences from the facts of this case, and his determination on the credibility were reasonable based on the record. The trial court determined the post operative treatment rendered by Dr. Schiavi fell below the standard of care. Based solely on the defendant's medical records, which do not indicate Mr. Rauch was limping and in severe pain on the April 29th visit, there was no deviation from the standard of care. However, according to the facts established at trial, that Mr. Rauch was limping, and complained of severe pain during this last visit, the trial judge determined that the medical records did not adequately reflect Mr. Rauch's condition. The trial judge's findings of fact as to Mr. Rauch's condition during the last post operative visit is supported by the record.
All of the physicians who testified, including the defendant, when given a hypothetical situation that met the facts, which the trial court decided occurred in this case, agreed on a course of treatment different from that followed by the defendant. Thus, we find the trial court did not abuse his discretion in his determination that Dr. Schiavi breached the standard of care in his postoperative treatment of Mr. Rauch.
The experts further testified that refracture at the site of the plate removal is a risk following this type of surgery, which is why care must be taken to protect the bone from stress during the post operative period. The trial court found that "it was Dr. Schiavi's returning Rauch to work under these circumstances which obviously led to the breaking of the femur in this case." The court further found had Dr. Schiavi ordered a bone scan, an MRI, or tomography, which would have shown the hairline or stress fractures through the screw holes, the fractures would have been discovered and Mr. Rauch would not have been returned to work. This finding is supported by the experts who testified that continued complaints of pain require further evaluation, and testing to determine whether stress fractures are present. The trial courts determination that the refracture was caused by Dr. Schaivi ordering the plaintiff to return to work without performing further testing to determine the cause of Mr. Rauch's pain is supported by the record.

DAMAGES:
The appellant contends that the amount of damages awarded by the trial court is excessive. The trial court awarded Mr. Rauch $100,000.00 for past pain and suffering, $25,000.00 for future pain and suffering, $50,000 for past mental anguish and loss of enjoyment, $25,000.00 for future mental anguish and loss of enjoyment, and $75,000.00 disability.
In reviewing a general damage award, the role of the appellate court is not to decide what it considers to be appropriate, rather the appellate court's role is to "review the exercise of discretion by the trier of fact." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). The appropriateness of the award in each case is determined by the facts particular to the case being considered. Id.
The timing of the refracture resulted in Mr. Rauch being unable to attend his daughter's wedding. Mr. Rauch's femur was fractured in two places, which necessitated the insertion of a metal rod into his leg. He had to undergo another surgical procedure to have the rod removed. Mr. Rauch and his wife testified extensively as to the pain, and resulting disability caused by the refracture. Prior to the refracture, Mr. and Mrs. Rauch led a very active life, which included travel, dancing, horseback riding, boating and fishing. Mr. Rauch also performed numerous chores around the home. Following this injury, he has been unable to participate in these *757 activities, and suffers from almost constant pain. Given these factors, we find no abuse of discretion in the general damages awarded to Mr. Rauch by the trial court.
The trial court awarded Mrs. Rauch $5,000.00 for loss of consortium and $10,000.00 for mental anguish. Mr. and Mrs. Rauch testified as to the affect this injury has had on their lifestyle and quality of life. We see no abuse of discretion in the loss of consortium award, however, the award for mental anguish is not supportable.
In Trahan v. McManus, 97-1224 (La.3/2/99), 728 So.2d 1273, a medical malpractice case, the Supreme Court held that an award for mental anguish to bystanders is appropriate only in those cases, which satisfy the requirements of Civil Code Article 2315.6. The Court held the doctor's negligence in negligently discharging a patient was not a traumatic event likely to cause severe contemporaneous mental anguish to an observer. Under this article, a bystander can only recover for mental anguish when there is a "temporal proximity between the tortuous event, the victim's observable harm, and the plaintiff's mental distress arising from an awareness of the harm caused by the event." Id. at 1279. The Court interpreted the Legislative intention as "to allow recovery of bystander damages to compensate for the immediate shock of witnessing a traumatic event, which caused the victim immediate harm that is severe and apparent, but not to compensate for the anguish and distress that normally accompany an injury to a loved one under the circumstances." Id.
In the case before us, the tortuous event was inadequate post operative treatment, which resulted in a second fracture of Mr. Rauch's leg. The negligent treatment did not occur simultaneously with the refracture. Under the guidelines propounded in Trahan, we find that the negligent post operative treatment was not an "injury causing event in which the claimant was contemporaneously aware that the event had caused harm to the direct victim." Id. at 1280. Accordingly, we find the trial judge erred in awarding damages for mental anguish to Mrs. Rauch.
The appellant also contends the trial court erred in awarding Mr. Rauch $207,848.00 in lost wages. Appellant argues that plaintiff did not prove that he is disabled from working all together, nor was there any evidence that he attempted to find alternative employment.
Lost wages do not have to be precisely proven, but must be shown with reasonable certainty; they may be proved with plaintiff's testimony alone. Taylor v. Premier, 98-1935 (La.App. 3 6/30/99), 742 So.2d 35. Mr. Rauch testified that prior to the second fracture, he earned $15.00 per hour. He testified that he planned to work eight years then retire. He has been unable to work since the refracture. Based on this testimony, he was awarded lost wages in the amount of $207,848.00. We find no error in this award.

COMPARATIVE FAULT OF MR. RAUCH:
The appellant argues that the trial court erred in failing to assign a percentage of fault to Mr. Rauch for ignoring Dr. Horn's recommendation to use crutches when walking. We agree.
The assigning of percentages of fault is a factual determination and as such is subject to the manifest error standard of review. Peck v. Wal-Mart Stores, Inc., 96-645 (La.App. 3 Cir. 11/6/96), 682 So.2d 974. Fault may be reallocated by the appellate court only after it has found manifest error, and may be lowered or raised only to the highest or lowest point, which is reasonably within the trial court's discretion. Medice v. Delchamps 96-1868 (La.App. 4 Cir.), 694 So.2d 528, writ denied, 97-1433 (La.9/19/97), 701 So.2d 174.
Dr. Horn's office notes clearly recommend the use of crutches to reduce the stress on Mr. Rauch's leg. Mr. Rauch acknowledged that Dr. Horn instructed *758 him to use crutches, and explained that he brought the crutches to the church, but did not use them while walking his daughter down the aisle because he did not want the crutches to be seen in the wedding pictures. Mr. Rauch fractured his leg when he pivoted on it placing his full weight on the leg when turning to walk to his seat. Mr. Rauch's failure to use crutches contributed to the cause of his injury. Based on this testimony, we find the trial court committed manifest error in not assigning a percentage of fault to Mr. Rauch. Accordingly, we assess Mr. Rauch's comparative fault at 25%. We rely on, Slavich v. Knox 99-1540 (La.App. 4 Cir.12/28/99), 750 So.2d 301, where 25% comparative fault was attributed to the plaintiff in a medical malpractice case due to the plaintiff's failure to act diligently in seeking treatment.
Both parties assert that under the Louisiana Medical Malpractice Act, under which Dr. Schiavi is covered, Dr. Schiavi is only responsible for the first $100,000.00 of the judgment plus interest, and the Louisiana Patient's Compensation Fund is responsible for all amounts plus interest in excess of $100,000.00. They request that we amend the judgment accordingly. However, the Patient's Compensation Fund is not a party to these proceedings. R.S. 40:1299.44 sets forth the procedure, which is to be followed to collect from the Fund. This statute requires that a certified copy of a final judgment in excess of $100,000.00 be presented to the State treasurer in order to collect excess amount from the Fund. As the judgment in this case is not final, due to the appeal, we are without authority to impose a judgment against the Fund at this point in the proceedings.

CONCLUSION AND AMENDED JUDGMENT:
For the foregoing reasons, the judgment of the trial court finding that Dr. Schiavi was negligent in failing to exercise that degree of care ordinarily practiced by physicians within the specialty of orthopedics is affirmed. Based on this court's assessment of 25% comparative fault to Mr. Rauch, the general damage award of $275,000.00 is reduced by 25% to $206,250.00, the lost wages award of $207,828.00 is reduced by 25% to $155,871.00, and the medical expenses award of $43,304.70 is reduced by 25% to $32,478.52. The trial court's mental anguish award of $10,000.00 to Mrs. Rauch is reversed, and the $5,000.00 loss of consortium award is affirmed. In all other aspects the Judgment of the trial court is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART.