482 So.2d 760 (1986)
Bobby E. LEE
v.
Scott Jack COOK, et al.
No. 83-CA-762.
Court of Appeal of Louisiana, Fifth Circuit.
January 13, 1986.
Writ Denied March 14, 1986.
*761 Cleveland, Barrios, Kingsdorf & Casteix, Carl W. Cleveland, Dawn M. Barrios, Bruce S. Kingsdorf, New Orleans, for Bobby E. Lee, plaintiff-appellant.
Becnel, Landry & Becnel, Daniel E. Becnel, Jr., Barry J. Landry, William B. Birner, Reserve, for Scott Jack Cook, defendant-appellant.
McGlinchey, Stafford, Mintz, Cellini & Lang, PC, Frederick R. Campbell, Michael E. Holoway, New Orleans, for GHR Energy Corp. (formerly Good Hope Refineries, Inc.), defendant-appellee.
Before CHEHARDY, KLIEBERT and CURRAULT, JJ.
CHEHARDY, Judge.
Plaintiff Bobby E. Lee instituted this suit for injuries allegedly received as a result of an intentional tort committed by Scott Jack Cook in a barroom brawl. Named defendants were Cook and Cook's employer, Good Hope Industries, Inc.[1] Following a trial by jury, judgment was rendered in favor of plaintiff for special damages in the sum of $330,000 against Cook and the suit against Good Hope Industries was dismissed. Each party filed various post-trial motions which were denied, and both parties appealed thereafter.
The incident occurred about 5 p.m. on October 31, 1979 at Marie's Lounge, Inc., a River Road barroom located in St. John the Baptist Parish. Cook admits striking plaintiff on the side of the head with a pool stick. As a result of the blow, plaintiff fell to the floor unconscious and later underwent brain surgery as a result of the altercation. He is now totally disabled.
The events leading up to this attack began that morning when plaintiff prepared to go to work for his employer, Bigelow-Liptac, a refractory coating company. The company had completed a job at Good Hope Industries about two weeks earlier, and plaintiff had been in charge of the work supervising the refractory job at Good Hope for his employer Bigelow from start to finish. In turn, the Good Hope construction superintendent oversaw the work on behalf of his employer and signed the time cards for the Bigelow employees, substantiating the hours they worked.
Wayne LeBourgeois, plaintiff's superior at Bigelow, informed him on October 31 that Good Hope might have other work available shortly and suggested plaintiff should take Tom Gray, the Good Hope construction supervisor, to lunch. Soliciting business was also one of plaintiff's duties, and he was reimbursed by Bigelow for entertainment expenses.
Plaintiff went to Good Hope, but Gray declined the invitation to lunch, explaining it was a rain-out day and he was "on call." Gray planned to go home early but intended to stop by Marie's Bar, so Lee offered to buy him a drink.
On the way out of the plant, Gray met Paul Faber, another construction supervisor and invited him to stop at Marie's. Gray and Lee went to Marie's about 11:30 *762 a.m. and had one or two drinks before they were joined by Faber about one-half hour later. The three men spent the afternoon drinking and shooting pool. Marie's does not serve lunch, although it does serve pizza and hot sausage. The men did not eat. They took turns buying the drinks and had about eight or nine drinks by 4:30 p.m. when Scott Jack Cook arrived.
Cook had just come from a three-hour interview at the plant for the position of maintenance manager and he wanted to tell his friends Gray and Faber about it. He had a drink or two and was playing pool with the men for about one-half hour. About that time plaintiff pulled several one hundred dollar bills from his pocket and wanted to play for high stakes. Gray and Faber told Lee to put the money away and go home, and Cook said he could not afford to play for high stakes. Lee became noisy and argumentative and Cook hit him hard on the side of the head with the butt end of a pool stick. Plaintiff fell to the floor unconscious, blood was streaming out of his ears and he was taken to the hospital.
The melee was over very quickly and Cook admits it never should have happened. The argument over playing for high stakes was insufficient provocation for the vicious blow to plaintiff's head.
In this court, Lee contends the trial court erred in: (1) failing to hold Good Hope Industries liable; (2) failing to award special damages; and (3) awarding inadequate general damages.
With reference to plaintiff's first complaint, he contends the trial court did not properly instruct the jury on the appropriate legal principles of course and scope of employment.
The court gave the following charge:
"To determine whether Cook's act took place during working hours, you must determine whether he was actually expected by the employer to be engaged in the employer's business at the time of the incident. In other words, you must determine whether he was on call for 24 hours, which necessarily means that Mr. Cook was on duty or working at that time. * * *"
The jury interrogatories asked if Scott Jack Cook was responsible for Bobby Lee's injury. The jury answered "yes." They were also asked if Cook "at the time of the act, [was] acting in the service of Good Hope Refinery so as to make Good Hope liable for damages." They answered "no."
We agree that the court's instruction to the jury did not fully explain the broad legal principles of course and scope of employment. However, the instruction which he gave, and two of the interrogatories we have discussed above, make it evident that the jury considered these decisive issues.
Whether an employee was acting within the course and scope of his employment must be decided on the facts of each case. Reed v. Gulf Ins. Co., 436 So.2d 580 (La. App. 4th Cir.1983); Babineaux v. Lavergne, 321 So.2d 401 (La.App. 3d Cir.1975). The test to be applied is whether the employee is performing some function for his employer and for which he was employed.
Some of the facts to be considered are the time the act was committed, whether the employee was obligated to perform this duty for the employer, the place, circumstances and purpose of the employee's act in relation to the promotion of the employer's business, the employee's motives in performing the act, and whether the employer had reason to expect that such an act would be performed by an employee. See Reed v. Gulf Ins. Co., supra; St. Paul Fire and Marine Insurance Co. v. Roberts, 331 So.2d 529 (La.App. 1st Cir.1976).
In the interest of judicial economy, the appellate courts have been authorized to render judgment on the merits if a jury instruction is erroneous or omitted. Gonzales v. Xerox, 320 So.2d 163 (La.1975). We have thus reviewed the record for any evidence to show that Cook was in the course and scope of his employment at the time of the attack. We conclude that he was not.
First of all, none of the construction supervisors at Good Hope had authority to *763 sign contracts. It was their duty to supervise the subcontractor's employees while they were working at Good Hope to the extent of determining whether they were on the job, and the Good Hope supervisor signed the subcontractor's work time cards, but they had no say in selecting the companies to perform the contract and the subcontractor's workers were supervised by their own employer's construction superintendent.
At the time of this incident, the contract had been completed two weeks earlier and the nature of plaintiff's visit was a goodwill gesture. Plaintiff's duties to entertain these men for Bigelow-Liptac may have resulted in them speaking well of his company to those who did have contractural authority, but at the time of this affair, everyone, including plaintiff, admitted that no company business was discussed.
The barmaid at Marie's thought the men were celebrating a contract, but this was long before Cook arrived, and her testimony is not even supported by plaintiff.
The trial court jury instruction was no doubt based upon testimony that on a rain-out day the employees get the day off, but the superintendents may leave but are "on call" if needed by the corporation.
When plaintiff went to Good Hope that morning it was to see Mr. Gray. Gray invited Faber and those two men, along with plaintiff, enjoyed a social afternoon with no mention of business. When Cook came along hours later, the "company business" he discussed with Faber and Gray was his own personal businessthat of applying for a better job at the plant. There was no discussion of a contract between Bigelow-Liptac and Good Hope, or of future work, and there is no evidence that the dispute which erupted into violence was employment related. The fight was certainly not incidental to the performance of duties owed by Cook to his employer. If, in fact, plaintiff had discussed mutual business with Messrs. Gray or Faber in the afternoon, it is highly unlikely in his inebriated condition later in the day that he would have been able to enter into such a discussion with Cook five hours later.
Even when an intentional tort is committed, the employer is not liable unless the conduct occurred while the employee was at least partly actuated by his purpose of acting for his employer and it was reasonably consequent upon or incident to his performance of his employment function. See LeBrane v. Lewis, 292 So.2d 216 (La.1974).
In the instant case, there is no showing that defendant Cook was in the course and scope of his employment for Good Hope Industries at the time of the altercation.
However, we do agree with appellant's second contention. He is entitled to an award for special damages as well as the award he was granted for general damages.
It would appear that the jury failed to award him special damages because it was aware he was receiving worker's compensation benefits of $148 per week and that his employer's compensation insurer (Travelers, who intervened in the suit and settled the compensation claim prior to trial) was paying medical bills and would continue to do so.
Under the collateral source rule in an action in tort by an injured employee against a third-party tort-feasor, where the tort-feasor is established and the employer does not intervene for reimbursement of compensation benefits paid, the plaintiff is entitled to recover the full amount of damages sustained by him without deduction of the amounts he has received from his employer as compensation benefits. Wallace v. Pan American Fire & Cas. Co., 352 So.2d 1048 (La.App. 3d Cir.1977), see also Bryant v. New Orleans Public Service, Inc., 414 So.2d 322 (La.1982); Richoux v. Grain Dealers Mutual Insurance Co., 175 So.2d 883 (La.App. 3d Cir.1965).
Plaintiff asks special damages as follows:

Past and future lost income $536,976.00
Income tax appellant will have to
 pay 424,311.00

*764
Therapy for five years $45,895.00
Travel Expenses for five years 7,526.00
 _____________
 Total $1,014,708.00

In support of his claim for special damages plaintiff testified he earned $14,400 per year plus fringe benefits of paid life and health insurance and a company car. LeBourgeois indicated these fringe benefits were worth an additional $8,000 to $9,000 yearly.
Dr. William Black, a neuropsychologist who evaluated plaintiff, recommended plaintiff receive psychotherapy at least once a week. Dr. Randolph Harper, a psychotherapist, concluded two weekly sessions for at least one to five years, and possibly for the duration of plaintiff's life, would help address plaintiff's major problems of anxiety and depression. These problems are due to the fact that there are limitations as to how much could be accomplished with plaintiff's problems in his speech and language. The cost of such sessions would amount to $8,500 yearly.
No evidence was presented as to past medical expenses or past or future expenses, if any, for prescriptions or transportation for treatment to date.
Dr. Melville Wolfson, a forensic economist, testified that plaintiff had a life expectancy of 37 years and a work life expectancy of 30.4 years from the date of the accident. Wolfson explained in detail how he arrived at his calculations for loss of wages from the date of accident to the date of trial. He used the actual wages lost plus fringe benefits lost from the date of the accident, subtracting from that figure wages earned during a trial period when plaintiff returned to work for several months but found he was unable to perform his former duties or even much less demanding duties to which he was assigned.
Dr. Wolfson based his calculations on future loss of income on a salary of $14,400 per year plus $8,000 fringe benefits, allowing for a moderate inflation rate and discounted to a current lump sum figure based upon plaintiff's work life expectancy. Assuming the sum is conservatively invested at the interest rate in effect at the time of trial, Wolfson concluded $536,976 would be necessary for past and future loss of income. He also indicated that plaintiff would have to pay income tax of $424,311 on those wages over his work life expectancy.
Using the same criteria (moderate inflation and discounted lump sum), based upon evidence of the need for future psychotherapy for 5 years at a present cost of $8,500, Wolfson concluded $45,895 would be necessary and that the cost of transportation from his home in Ponchatoula to the doctor's office (40 miles round trip) would require a present award of $7,926. The special damages, based upon Dr. Wolfson's testimony, amount to $1,014,708.
We accept Dr. Wolfson's calculations except for the income tax plaintiff will have to pay for wages. We know of no case, and have been cited to none, which would award plaintiff lost wages and condemn defendant to also pay plaintiff's taxes. Subtracting the $424,311 income tax from the total $1,014,708, we conclude plaintiff is entitled to an award for special damages in the sum of $590,397 in addition to an award for general damages.
Relative to appellant's third contention, we affirm the quantum of $330,000 for general damages. Plaintiff's injuries are indeed serious. He required brain surgery and developed seizures secondary to his injury. He has difficulty with his memory, he now reads at a fourth grade level, has a third grade spelling level and a sixth grade math level. He has difficulty coping with stress and he is depressed. He tested as a mildly abnormal personality after the operation, and tests made two years later showed no improvement. His memory, language and emotional difficulties are related to the brain injury. The doctors do not expect him to improve. He is not presently employable.
Plaintiff did return to work for a few months after the accident, but he was discharged because he was unable to do the *765 work. The doctors think it is highly unlikely that he will ever be able to work again.
Prior to the accident, plaintiff was very active. He played golf, football, basketball, went hunting, crabbing, fishing and enjoyed playing with his children. While he is able to dress, eat and take care of himself, he is unable to take care of his business affairs.
The award of general damages is not excessive considering the serious nature of plaintiff's injuries, but neither do we consider it inadequate. We will affirm that award.
We now address defendant Cook's appeal. He has supplied us with a three-page brief for this very complex litigation. Plaintiff contends Cook is not entitled to an appeal since he dismissed the appeal rather than agree to pay part of the cost for the transcript. We find no dismissal of his appeal in the record.
From what we are able to determine from Cook's brief, he concludes the trial court erred in failing to find that a worker's compensation suit was plaintiff's sole remedy; and alternatively that he is entitled to a credit of $165,000 against the $330,000 award, because plaintiff voluntarily dismissed a joint tort-feasor's insurer prior to trial.
We find no merit in these contentions. Plaintiff's claim for worker's compensation is exclusive as to his own employer, Bigelow-Liptac, but Cook is a third-party tort-feasor.
Cook claims that by plaintiff's voluntarily dismissing the insurer of a co-tort-feasor, he is entitled to be credited with one-half of the judgment as to that defendant's viable share.
The insurer so dismissed was Guaranty National Insurance Company, the insurer of Marie's Lounge, Inc., and its owner. The lounge and the owner were dismissed after trial on exceptions of no cause of action and prescription. Their insurer was dismissed one year later. Since there was never any finding that the lounge or the owner were co-tort-feasors, there is no liability on the part of their insurer.
For the reasons assigned the judgment appealed from is amended to award plaintiff Bobby E. Lee the additional sum of $590,397 for special damages against defendant Scott Jack Cook. In all other respects the judgment appealed from is affirmed. All costs in this court are to be paid by defendant Scott Jack Cook.
AMENDED AND AFFIRMED.
NOTES
[1] Other defendants and an intervenor were all dismissed either voluntarily or by judgment of the court on exceptions prior to trial.