# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-534

THOMAS C. ROYER

VERSUS

STATE OF LOUISIANA, DEPARTMENT OF TRANSPORTATION & DEVELOPMENT

**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C-80379, DIV. B
HONORABLE LALA BRITTAIN SYLVESTER, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

**AFFIRMED IN PART; REVERSED IN PART;
REMANDED WITH INSTRUCTIONS.**

Victoria R. Murry, Assistant Attorney General
Louisiana Department of Justice
P. O. Box 1710
Alexandria, LA 71309
(318) 487-5944
COUNSEL FOR DEFENDANT/APPELLANT:
    State of Louisiana, Department of Transportation & Development

Scott J. Chafin, Jr.
Julie Payne Johnson
J. Cole Sartin
Verity Gentry Bell
Gregorio, Chafin & Johnson, L.L.C.
7600 Fern Ave., Building 700
Shreveport, LA 71105
(318) 865-8680
COUNSEL FOR PLAINTIFF/APPELLEE:
    Thomas C. Royer

**GREMILLION, Judge.**

The defendant-appellant, the State of Louisiana through the Department of Transportation and Development (DOTD), appeals a jury verdict in favor of the plaintiff-appellee, Thomas C. Royer, for injuries he sustained after hydroplaning on Louisiana Highway 1 in Natchitoches. For the following reasons, we affirm in part, reverse in part, and remand with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2006, Royer was seriously injured when he hydroplaned on Louisiana Highway 1 in Natchitoches Parish, while in the course and scope of his employment. In July 2007, he filed suit against DOTD, alleging that his damages were due to an unreasonably dangerous condition in the roadway. In July 2008, Stonehurst Commercial Insurance Company, the workers' compensation insurer of Royer's employer, Mobile Air of Louisiana, LLC, filed a petition of intervention, asserting its right to reimbursement. However, in February 2013, Stonehurst settled with Royer for $150,000 and waived its lien for repayment of benefits. In September 2015, DOTD filed a motion in limine seeking credit for payments made by Stonehurst, which the trial court later denied. In October 2015, DOTD filed for supervisory writs to this court from the denial of its motion in limine, which we denied.

A three-day jury trial was held from October 12-15, 2015. The jury returned a verdict finding DOTD 100% at fault in causing the accident and awarded damages as follows:

| | |
|---|---|
| Past Medical Expenses | $292,105.49 |
| Future Medical Expenses | $681,376.48 |
| Future Loss of Support | $1,500,000.00 |
| Past Lost Wages | $330,310.00 |

| Future Lost Earnings | $763,131.00 |
| Mental and Physical Pain and Suffering of Thomas Royer | $200,000.00 |
| Loss of Enjoyment of Life | $0.00 |

DOTD filed a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a motion for new trial in October 2015. Following a December 2015 hearing, the motion was denied.

DOTD appeals the jury's verdict and the trial court's denial of its motion for JNOV or, alternatively, motion for new trial. DOTD assigns as error:

1. The trial court erred in denying the DOTD's Motion in Limine on the issue of the collateral source rule.

2. The trial court erred in signing a judgment on jury verdict, incorporating the jury verdict form which was internally inconsistent and resulted in double recovery of future lost wages to the plaintiff, or alternatively failed to properly classify loss of supportive services as future medical expenses.

3. The trial court erred in signing a judgment on jury verdict that failed to incorporate the mandatory language set forth in R.S. 13:5106 with regard to Future Medical Expenses to be paid through the Future Medical Fund.

4. The trial court erred in signing judgment on jury verdict that awarded legal and judicial interest on future medical care expenses that are to be paid from the Future Medical Care Fund.

5. The jury's verdict in this case on the issue of liability is manifestly wrong where the DOTD maintained the roadway at issue in accordance with DOTD standards for maintenance.

## DISCUSSION

*Manifest Error-Liability*

We will first address DOTD's assignment of error claiming that the jury erred in finding it liable because a finding that it was not liable would render the remaining issues moot. It does not appear that DOTD seriously contests the matter

2

of liability, as it is afforded only one page of its thirty-page brief. Nevertheless, we will review the jury's finding using the manifest error/clearly wrong standard.

The supreme court recently summarized the manifest error standard of review:

> This court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). *See Mart v. Hill,* 505 So.2d 1120, 1127 (La.1987). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. *See id.* The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *See id.*

*Lobell v. Rosenberg,* 15–247, p. 10 (La.10/14/15), 186 So.3d 83, 90.

> . . . [I]t is the duty of the Highway Department to construct and maintain the highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence. *Coleman v. Houp*, 319 So.2d 831 (La.App.3d Cir. 1975). In the performance of this duty, the character of the road and the probable traffic must be kept in view, as the requirement of reasonable safety implies reasonable safety for any lawful or proper purpose. *Kilpatrick v. State*, 154 So.2d 439 (La.App.2d Cir. 1963). In order to hold the Department of Highways liable for an accident caused by an unsafe or hazardous condition it must be shown that the Highway Department had prior notice, either actual or constructive, of the dangerous condition and had sufficient opportunity to remedy same or at least to alert and warn motorists of its presence and failed to do so. *Coleman v. Houp*, 319 So.2d 831 (La.App.3d Cir. 1975).

*United States Fidelity and Guaranty Co. v. State of Louisiana, through the Department of Highways*, 339 So.2d 780, 785 (La. 1976). We will review the testimony and evidence presented at trial.

Trooper Jason Sanders, a sergeant with the Louisiana State Police, arrived at the scene of the crash. He said that there was water "flowing down the roadway" in the ruts. Trooper Sanders said that as he approached the crash scene:

[W]hen I got to the bottom of the hill, my car hydroplaned and it, once it came back in contact with the roadway, I began going up the hill and I could feel, I could feel the movement in my vehicle. I wouldn't say it, it wasn't quite a hydroplane but it was movement.

Several pictures taken by Trooper Sanders at the scene of the accident were admitted into evidence. They show significant damage to the Mobile Air work truck that Royer was driving but particularly to the driver's side. The pictures also depict water standing in the ruts of the roadway, even though it was no longer raining. Royer was unresponsive at the scene, so Trooper Sanders was unable to question him. Besides the hydroplaning, Trooper Sanders opined that inattentiveness of the driver and vehicle conditions could have been contributing factors to the accident.

Joe Haynes, meteorologist in Shreveport for KTBS and a forensic meteorologist, testified that he analyzed various data sources to determine the weather conditions at the approximate time (1:30 p.m.) the accident occurred. He testified that more likely than not it was raining at the time the accident occurred.

Jerry Burnaman, a former Engineer Tech 7 DOTD employee at the time of the crash, testified that in order to maintain Louisiana highways in a reasonably safe condition, water should flow off of the roadway rather than accumulate in ruts. Burnaman agreed that if the ruts were full of water, and water was flowing downhill in the ruts, the roadway had not been properly maintained.

Jonathan Lachney, the Assistant District Administrative Engineer for DOTD in Alexandria, Louisiana, testified that a Parish Maintenance Supervisor travels the roads bi-weekly.

Scarlett Pomerantz testified that she has lived on Highway 1, less than a quarter of a mile away from where the accident occurred, for fifteen years. Pomerantz testified that she called DOTD twice to report the ruts in the road and

4

the need for a sign, but that as of the date of trial, the ruts were still there. She said that she has seen several single-car wrecks in the same area when the roads are wet, including an 18-wheeler that flipped over.

Thurgood Flanagan, a DOTD employee from 1972-2007, was the Natchitoches Parish Maintenance Supervisor at the time of the accident. He planned and supervised maintenance of the roads in Natchitoches Parish. Flanagan reviewed his inspections records indicating that he had driven over the roadway where the accident occurred at least twenty-six times a year. However, he said that he had actually driven over that roadway at least fifty-two times per year and that he knew what condition the roadway was in. Flanagan said that DOTD knew the road held water and that employees would routinely go out and drain water off of the road by making a trench with a shovel in the area where the shoulder meets the grass.

Flanagan testified that between 1997 and 2005, DOTD crews went out to the location of the accident nineteen times to drain water from the roadway, which took many hours each time. When questioned why DOTD did not just fix the ruts, Flanagan stated "my belief was where that wreck happened it wasn't, it wasn't bad." Flanagan testified that he knows nothing about cross-slopes, road grades, or rut-depth. He said that he did not notice a problem with this area of the roadway, and, if he had, he would have had a crew go out and fix it.

Rhett Desselle, the Assistant District Administrator of DOTD over seven parishes, including Natchitoches, is responsible for bridge inspection and maintenance, traffic engineering and operations, and equipment fleet and repair shops. Desselle said that the roadway in question came into existence in 1925 when there was no design standard for cross-slope. Desselle discussed a project in 1991 involving overlay and widening of an existing rural road. He said that in

1991, a pavement cross-slope of 2.5% would have been desirable. However, Desselle testified that pursuant to La.R.S. 48:35(B), Chief Engineers are allowed to make exceptions to design standards. He said the guidelines are examples to work toward, but that throughout Louisiana there are road situations in which DOTD is constrained from meeting all of the guidelines.

Desselle testified that he does not know what the cross-slope of the roadway in question is because he had never measured it or found out that information, nor did he know what the cross-slope was on the date of the accident. Desselle, who identified himself as the corporate representative of the State who was there to testify about policy, procedure, and general history for the overall department, stated he took responsibility for not knowing the cross-slope of the area in question.

Regarding the six hundred feet of rutting in the roadway, Desselle testified that there was not a specific threshold for rutting repair. He said that DOTD would make the repairs based on recommendations from supervision and maintenance crews, accident reports, and recommendations from the Louisiana State Police following reports of dangerous areas on the roadway. When asked why DOTD did not fix the ruts in the roadway, Desselle testified:

> There, there was, no indication from anything that we were aware of that the road was not safe. There was [sic] no accidents that we were aware of. Uh, we have complaint records. There was [sic] no complaints that I was aware of that uh, there was issues with the roadway. So the visual inspections that Mr. Flanagan was doing every two weeks, and the inspections that they were doing during the rainfalls and after the rainfall events, everything was functioning, was functioning and was safe, to a reasonably prudent driver.

Desselle testified that Highway 1 where the accident occurred was originally intended to become a four-lane highway; therefore, there was only a one-way slope on the road. However, the road was never four-laned. In the meantime, various

6

overlay or resurfacing projects were completed by DOTD. Regarding the 1991 project, Desselle stated:

> We put an inch and a half of wearing course which is the top layer and two inches of binder and then we, we surfaced the existing shoulder and then we did some coal plaining like the plans say. Uh, the note in the plans say develop a .025 cross slope where possible. Again we had design standards at the time these plans were put together. They were effective March 1990. They were called new overlay standards and, and uh, they did say that and I read that earlier, that it did require a .025 in the design standards. But because we had already paved, we had a roadway like this and we had shoulders on each side. We can't come back and make this thing a roof top. There's, there's just, you have to basically tear the roadway up and start over. Well that's not the type of work we were coming in to do. . . . And that's the reason why uhm, we had a design exception that we didn't have to meet the design standards. Because the scope of the work wasn't to build a new roadway. It was just to resurface.

Thus, Desselle affirmed that although the design standards called for 2.5% cross-slope, "it wasn't possible at this location." However, on cross-examination he stated that none of the plans noted that it was not possible to meet the design standards.

Dr. John Glennon, an engineer since 1964, testified that his education includes traffic engineering, and highway design, maintenance, and safety. In 1964, Dr. Glennon began working for the California Division of Highways conducting highway research work, and he continued in this line of work around the country. Dr. Glennon stated that his work encompassed evaluation of highway cross-slope, rut-depth, and surface texture. His work further involved determining if road conditions could lead to hydroplaning. He said that he has testified as an expert in highway engineering in forty-five states.

Dr. Glennon discussed cross-sloping two lane highways, which means that the road is highest in the center and sloped to the sides to drain off onto the shoulder to prevent water from standing on the road and causing hydroplaning.

7

Dr. Glennon measured the cross-slope and rut-depth where the accident occurred. He said that based on his research, DOTD's standard for cross slope in the area where the accident occurred is 2.5%. Dr. Glennon said that the ruts in a highway should be repaired when they are deep enough to hold enough water to cause hydroplaning. He said that a general rule of thumb is that hydroplaning occurs when a person is traveling at speeds of greater than fifty miles per hour and there is a tenth of an inch of water on the pavement.

Dr. Glennon then reviewed the cross-slope measurements he took at 150, 200, 250, 300, 350, 400, 450, and 500 feet north of the impact point. The cross-slope ranged from zero to .69%, far less than the 2.5% slope recommendation. Dr. Glennon was asked, "Did you find that the State broke its own rules for cross slope?" to which he answered, "Absolutely." He next reviewed the rut-depth measurements he obtained. First, he discussed DOTD's use of 1/8 of an inch measurement rather than 1/32 of an inch measurement he used:

> Well it's one, the, an 8th's of an inch is four times greater than a 32nd of an inch so it's not near as accurate. I really have trouble understanding how they measured an 8th's of an inch because surveys are not done that way. So I'm not at all sure. I still haven't heard how that was done. So I'm curious.

He then described how the water would fill the ruts:

> [W]hen there's a flat cross slope with deep ruts the water is going to flow in those ruts until they're full before it spills out to the side. So if you're talking about it raining we have a, say take a point that's right at the top of the hill and the rain drop falls there. That rain drop will go downhill in the rut. The next 10th of a foot there's a rain drop, it goes downhill. Next, down, down, down. It keep accumulating as it goes downhill until that rut is full. And then some it will spill out to the side actually very slowly because the cross slope is not very uh, very steep. So the ruts will remain full all the way probably to the bottom of the hill in this case. Uh, and some of it spilling across. Of course, . . . it won't spill out of the right rut until the left rut, water comes out of the left rut will go into the right rut and it will fill until it spills out so. Uh, you know it's a cumulative process going down the hill.

Dr. Glennon opined that he determined that if the cross-slope had been correct, most of the ruts would not have held water at all except for the deepest ruts, which would have held less than a tenth of an inch of water.

Dr. Glennon then discussed variables that could contribute to hydroplaning other than water depth in the ruts, such as tread wear, vehicle speed, and surface conditions of the road. Dr. Glennon testified that all of the tires on Royer's work truck met legal requirements for tread depth, and there was no indication that Royer was speeding. Dr. Glennon concluded that an unreasonably dangerous condition existed on Highway 1 that caused Royer to hydroplane because of the flat cross slope, improper rut depth, and smooth surface texture that caused Royer's truck to hydroplane. Dr. Glennon said that the water depth of the ruts was five to six times more than the minimum required to hydroplane.

David Christophe, Jr., a truck driver who lives across the street from Pomerantz, testified that Louisiana Highway 1 where the accident occurred only holds water when it "pours down rain at the bottom of the hill or whatever." He also said that he has never witnessed or known of any accidents in the area other than this one. Further, he said he was unaware of deep ruts in the area.

Mel Harrison, a professional land surveyor and DOTD employee, surveyed the accident area in July 2013, at DOTD's request. Harrison used a different method to determine cross slope and gathered approximately 360 measurements in a 400-500 foot area surrounding the accident. Harrison testified that grade of this highway varied from 2.8% to 3%. As to slope he found "0.8% is what I measured which is a little over an inch drop in the 12 foot lane." Regarding the depressions or ruts in the roadway, Harrison said the average rut depth was 3/8 of an inch or .375. Harrison was questioned:

Q. . . . So if hydroplaning happens in .10 inches of water your measurements would indicate that those ruts averaged .375 inches deep.

A. That's correct.

Q. In the southbound lane?

A. Correct. In the area we're concerned with, yes sir.

Q. Sure. More than 3 ½ times the amount of water Dr. Glennon says it takes to hydroplane.

A. That's correct.

. . . .

Q. So the DOTD survey equipment showed that in the lane Tommy was traveling the rut depth was .375 and the cross slope was less than 1% at 0.8%?

A. That's correct.

Dr. Joseph Blaschke, an engineer for forty years in the area of highway design, traffic engineering, and accident reconstruction, testified that early in his career he worked in traffic management for the military, conducted safety studies on military installations throughout the United States, was a traffic engineer for the City of Houston, was a professor, and a highway design consultant. Dr. Blaschke examined the scene in June 2013. He did not think the ruts were extremely deep, but he took no measurements, instead relying on survey measurements. He said that in "most true hydroplane accidents" there is very high speed, very poor tires, and a whole lot of water. He said that partial hydroplaning or "slip and sliding" is very common and results in most accidents rather than true hydroplaning.

Dr. Blaschke opined when asked if it was more probable than not that Royer hydroplaned:

Given the facts, there's no indication of high speed anywhere mentioned. His tires were not in that bad of shape. I'm not quite sure about tire pressure cause I think the rear tires had good pressure. One tire was flat the other front tire had low

10

pressure but can't guarantee that that front tire had low pressure at the time of the accident. We don't have intense rainfall, no record of that. We're not even sure, I can't even say for sure it was rain at the time of the accident. Certainly could have been. But there's no indication of intense rainfall. And I don't know how you're gonna have a lot of water in these ruts if it's not raining hard and there's no way to pond in the ruts so they're gonna drain. So the factors that go into hydroplaning simply don't exist in this case. Therefore I would think the chances of hydroplaning would be very slim.

Dr. Blaschke further testified that a 2.5% cross slope would not have made a difference, stating that due to "extremely light rainfall" and the rut depths found here.

On cross-examination, Dr. Blaschke stated that he had testified on behalf of the State of Louisiana in approximately 650 cases and that 12% of his income resulted from contracts with the State, which initially began in 1983. In 2014, Dr. Blaschke was paid $135,602.53 by the State of Louisiana.

*Liability*

DOTD argues that it met its own maintenance standards of not repairing ruts in a road unless the ruts are an inch or more in depth over a distance of ten feet. DOTD claims that Royer failed to prove that these standards were unreasonable. After reviewing the evidence presented to the jury, we find no manifest error in its finding that the DOTD bore 100% of the responsibility for this accident. Numerous experts, including the DOTD's own experts, testified that the grading and ruts in the road did not even meet DOTD's standards. There can be no doubt that DOTD was aware of the unreasonable condition on the roadway, since it traveled the area in question many times, had gone out to the area to sweep away water and dig trenches more than nineteen times, and had been informed by at least one local resident that the area was dangerous. Accordingly, this assignment of error is without merit.

11

*Collateral Source Rule*

We review a trial court's decisions regarding motions in limine using the abuse of discretion standard. *Scott v. Dauterive Hosp. Corp.*, 02-1364 (La.App. 3 Cir. 4/23/03), 851 So.2d 1152*, writ denied*, 03-2005 (La. 10/31/03), 857 So.2d 487. Additionally, because this issue involves a question of law, a de novo review is warranted. *Cleco Evangeline, LLC v. Louisiana Tax Commission*, 01-2162 (La. 4/3/02), 813 So.2d 351.

DOTD argues that it should receive a credit for medical bills and disability wages paid by Stonehurst. DOTD states that the "principles of solidarity should apply to create a credit in favor of the State of Louisiana in the amount of payments made by the employer and/or it's workers' compensation" and that the collateral source rule should not be applied to bar the State from receiving a credit, because otherwise the plaintiff gets a windfall in the form of double recovery. DOTD argues the double recovery amounts to punitive or exemplary damages, and that no policy goals are furthered by applying the collateral source rule, because wrongful conduct is still deterred since DOTD is still liable for the non-workers' compensation paid portion of Royer's lost wages, all future lost wages, all future medical expenses, and general damages. DOTD relies on *Cutsinger v. Redfern*, 08-2607 (La. 5/22/2009), 12 So.3d 945, and *Bellard v. American Central Ins. Co.*, 07-1335, 07-1399 (La. 4/18/08), 980 So.2d 654, in support of its argument.

*Bellard* involved a workers' compensation carrier and an uninsured motorist carrier, neither of which were tortfeasors, although the UM carrier was solidarily liable with the tortfeasor. The supreme court held that the collateral source doctrine did not apply, and the uninsured motorist insurer was entitled to a credit based on the payment made by the workers' compensation insurer. Based on the

12

supreme court's analysis in *Bellard*, it would be hard to deny that a workers'

compensation carrier and a tortfeasor are solidary obligors to a certain extent:

> [B]y virtue of the workers' compensation act, the employer and/or its workers' compensation insurer is required to pay, subject to statutory considerations, certain amounts which the injured employee is entitled, under other provisions of law, to recover as damages from tortfeasors. For example, disability wage and medical benefits payable under the workers' compensation act compensate the injured employee for the same damage that a tortfeasor would be compelled to pay under LSA-C.C. art. 2315.

*Bellard*, 980 So.2d 654 at 664-65.

Thus, both the workers' compensation carrier and, in this case, DOTD

"share coextensive obligations to reimburse the tort victim for lost wages and

medical expenses incurred as a result of his or her injury at the hands of a

tortfeasor." *Id.* at 665. This obligation is solidary regardless of the fact that the

sources of the obligations are different, the obligations are regulated by contracts

with differing limits, i.e., insurance contract terms, and the parties' liability is in

differing amounts. *Id.* Further, pursuant to La.Civ.Code art. 1794, payment of the

debt owed to the creditor exonerates the other from the debt owed to the creditor.

In *Bellard*, the supreme court defined the collateral source rule and its

jurisprudential underpinnings:

> [T]he rule provides that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." Under the collateral source rule, payments received from an independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer. As a result, the tortfeasor is not allowed to benefit from the victim's foresight in purchasing insurance and other benefits.

> Several public policy concerns support the collateral source doctrine. The concern most often voiced is that the tortfeasor should not gain an advantage from outside benefits provided to the victim independently of any act of the tortfeasor. The objective in this regard is to promote tort deterrence and accident prevention. Another concern advanced that, absent the collateral source rule,

13

victims would be dissuaded from purchasing insurance or pursuing other forms of reimbursement available to them.

Of the reasons cited in support of the rule, "[t]he major policy reason for applying the collateral source rule to damages has been, and continues to be, tort deterrence." In other words, the rule is grounded in the belief that the tortfeasor should not profit from the victim's prudence in obtaining insurance, and that reducing the recovery by the monies paid by a third party would hamper the deterrent effect of the law.

*Bellard*, 980 So.2d 654 at 668 (citations omitted).

Nevertheless, the supreme court noted that lower courts have struggled with the situation when the victim receives compensation from an outside source, because the goal of making the victim whole is thwarted when the victim recovers the same element of damages twice. *Id.*

Neither *Bellard* nor *Cutsinger* involved a workers' compensation insurer and the tortfeasor as solidary obligors. They both involved UM carriers and workers' compensation carriers as solidary obligors. Thus, it is much easier to determine that the collateral source rule does not apply when neither of the solidary obligors should be subject to the deterrence goal of the collateral source rule. In this case, we have the tortfeasor and a workers' compensation carrier. Clearly, DOTD should be subject to the policy goal of deterring negligent behavior. On the other hand, *Bellard* clearly held that a plaintiff does not provide consideration for workers' compensation benefits and "will receive a windfall or double recovery . . . without having sustained a diminution in his patrimony because of the availability of workers' compensation benefits." *Id.* at 669-670. Thus, we have competing interests in this situation: tort deterrence versus gratuitous, i.e. no consideration given, double recovery.

*Cutsinger* was decided shortly after *Bellard* and, again, involved a UM carrier's request for a credit for workers' compensation paid to the plaintiff. In

14

*Cutsinger*, a panel of this court distinguished *Bellard* by finding that the plaintiff had given consideration for the UM policy as it was her own, rather than an employer's policy. The State Farm UM policy also contained a specific provision stating that the amount it would owe under the UM policy would be reduced by any amounts paid in workers' compensation. The supreme court, referencing its *Bellard* decision, had no trouble finding that the UM carrier and workers' compensation carrier were solidary obligors. It further found that the payment by the workers' compensation carrier relieved the UM carrier of the obligation for the same damages. The supreme court thoroughly reviewed *Bellard* and admonished us for interpreting it "too narrowly." *Cutsinger*, 12 So.3d 945 at 954. The court stated:

> While it is important to consider whether plaintiff paid for the collateral source or suffered some diminution in her patrimony due to the availability of the benefit to determine whether a double recovery would result from application of the rule, this consideration alone is not the determinative factor in deciding whether the collateral source rule applies. The collateral source rule exists to prevent the tortfeasor from benefiting from the victim's receipt of monies from independent sources. In this way, the collateral source rule furthers the major policy of tort deterrence. In this case, the tortfeasor is not requesting the credit for workers' compensation benefits paid. The tortfeasor will reap no benefits if the collateral source rule is not applied and the uninsured motorist carrier is allowed to reduce its payments to plaintiff by the amount of workers' compensation benefits she received. The tortfeasor's position will not change whether or not the credit is allowed. Thus, application of the collateral source rule would not further the major policy goal of tort deterrence.

*Id.*

The supreme court primarily relied on the UM policy language, which has been found enforceable and not against public policy, in making its determination that the collateral source rule did not apply in this instance. The supreme court stated,

> [W]e cannot say that she paid for uninsured motorist coverage to compensate her for benefits such as lost wages and medical

15

> payments . . . because the uninsured motorist policy she purchased contained language specifying that any amount payable under uninsured motorist coverage shall be reduced by any amount paid under workers' compensation benefits. Consequently, when she paid the premium for the uninsured motorist coverage, she did not pay for it to cover benefits paid by the workers' compensation insurer.

*Id*. at 954-55.

In neither *Cutsinger* nor *Bellard* did the plaintiffs give consideration, and the goal of tort deterrence was not met. Another possibility is a situation where a plaintiff gives consideration, but the primary goal of tort deterrence is not met because the party claiming the offset is not the tortfeasor (i.e. a plaintiff's private insurer and insurance from another source). A third set of facts would involve a plaintiff who gives consideration and the goal of tort deterrence is met. In this case, we have a plaintiff who has not given consideration and a tortfeasor claiming a credit for a payment made by a collateral source, a workers' compensation insurer. If the primary goal of the collateral source rule is tort deterrence, the collateral source rule applies to a tortfeasor, even if consideration, in the form of policy payments, is non-existent, as will always be the case when a workers' compensation carrier is the collateral source. We find that the overriding policy of tort deterrence outweighs the concern of double recovery.

This holding is in line with previous jurisprudence of this circuit. In *Taylor v. Premier Ins. Co. of Massachusetts*, 98-1934, 98-1935, p. (La. App. 3 Cir. 6/30/99), 742 So.2d 35, 43-44, we stated:

> The "collateral source" rule holds that a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be diminished, because of benefits received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. *Kidder v. Boudreaux*, 93-859 (La.App. 3 Cir. 4/6/94),; 636 So.2d 282; *Williamson v. St. Francis Medical Center*, 559 So.2d 929 (La.App. 2 Cir. 1990), *Brannon v. Shelter Mut. Ins. Co.*, 520 So.2d 984 (La.App. 3 Cir. 1987); *Doerle v. State Through Dept. of Highways,* 147 So.2d 776 (La.App. 3 Cir. 1962). In *Lee v. Cook*,

16

482 So.2d 760, 763 (La.App. 5 Cir.), *writ denied,* 484So.2d 137 (La.1986), our brethren in the fifth circuit held:

> Under the collateral source rule in action by an injured employee against a third-party tortfeasor, where the tortfeasor is established and the employer does not intervene for reimbursement of compensation benefits paid, the plaintiff is entitled to recover the full amount of damages sustained by him without deduction of the amounts he has received from his employer as compensation benefits. (Citations omitted).

See also *Hall v. State Dep't of Highways*, 213 So.2d 169 (La.App 3 Cir. 1968), and *Wallace v. Pan American Fire and Cas. Co.*, 352 So.2d 1048 (La.App. 3 Cir. 1977), *writs denied*, 354 So.2d 209 (La. 1978). Accordingly, we find no abuse of the trial court's discretion in denying DOTD's motion in limine and thus, assignment of error number one is without merit.

### *Jury Verdict Form*

In assignment of error number two, DOTD contends that the trial court erred in denying its motion for Judgment Notwithstanding the Verdict (JNOV), because the trial court erred in signing a judgment when defects in the jury form existed; to wit, the form was internally inconsistent and resulted in double recovery of future lost wages, or, alternatively, failed to properly classify loss of supportive services as future medical expenses.[1] We need not address this assignment by DOTD because it has waived any objection to the form by failing to preserve the issue for appeal by contemporaneously objecting to it. DOTD only argued for the first time, one week after the jury returned its verdict, that the jury verdict form was deficient. It is well settled that a party's failure to object to the jury form at the trial stage results in the waiver of any alleged error. *Guillot v. Guillot*, 14-364 (La.App. 3 Cir. 12/23/14), 161 So.3d 841; La.Code Civ.P. art. 1812(B). Moreover, it is well

---

[1] DOTD additionally argues in brief that "loss of future support" was not an available element of damages in this case pursuant to La.R.S. 13:5106 while the plaintiff argues that loss of future support was in the nature of household services. We need not address this issue because of DOTD's failure to object.

settled that a jury is vested with great discretion in making damage awards, and, therefore, the awards should rarely be overturned on appeal. *Youn v. Maritime Overseas Corp., et al.,* 623 So.2d 1257 (La.1993). The amount of the jury's damage award evidences its intent to adequately compensate the plaintiff for his injuries. It is impossible for us to determine how the jury decided to award $1,500,000.00, which was significantly less than even the most conservative life care plans set forth by the plaintiff's experts and significantly more than the plan set forth by the defendant's expert. Furthermore, $1,500,000.00 is not an unreasonable award for the significant injuries and future life care sums testified to at trial as provided below.

Dr. Pierce Nunley, an orthopedic spine surgeon, first saw Royer in January 2008, and over several years treated him conservatively for back pain with physical therapy, home exercises, and facet joint injections. However, Royer underwent a total disk replacement at L4-5 in January 2011. By February 2012, Royer was released from Dr. Nunley's care and told to return on an as-needed basis. Dr. Nunley testified that Royer's back pain and subsequent surgery was more probably than not a result of the August 2006 accident.

Dr. Edwardo Gonzales-Toledo, a professor of radiology, neurology and anesthesiology at LSU Health Sciences Center School of Medicine and director of the department of radiology at the University Health Hospital, testified regarding Royer's traumatic brain injury (TBI). He noted that a CT scan from August 2006 showed he had a bleed in his brain in the left frontal lobe, which controls the main functions for cognitive thinking, planning, and attention. Dr. Gonzales-Toledo stated "it's the most important lobe, because it's the difference between human and animals. It's practically your personality." A later CT scan of Royer's brain in early October 2003, showed post-traumatic encephalomalacia, which means the

destruction of the brain or loss of the normal brain tissue. The brain scarring is permanent. Dr. Gonzales-Toledo continued to review detailed aspects of Royer's brain, as evidenced by MRI scans, that had been damaged by the accident that affected his daily living, behaviors, routines, and abilities. Dr. Gonzales-Toledo said the brain damage is permanent.

Dr. John Hinrichsen, an ophthalmologist and specialist in adult strabismus, treated Royer in August 2007, for left hypertropia of his eye that resulted in left superior oblique palsy, which has caused Royer to have headaches, tunnel vision, blurry vision, and double vision. He testified that Royer's TBI caused him to have double vision and other visual problems for which strabismus surgery was required. However, Dr. Hinrichsen did not know of Royer's condition subsequent to 2008.

Amanda Keil, Royer's sister-in-law, testified that, since the accident, Royer's personality has changed and he has outbursts.

Louis Chatagnier, who knew Royer from church before the accident occurred, said Royer had changed. He stumbled when he walked; behaved oddly, with his speech slurred at times; he did not complete sentences; and he would "wander off" and was confused. However, he admitted on cross-examination that Royer's golf game had improved, and he was active in church.

Royer testified to how his TBI has affected him. He said that he cannot remember things, particularly things dealing with numbers, dates, and times. He testified that he now has very bad mood swings for no known reason. He said the gets really mad and does not even recall what occurred. Royer said that he has lost friends and contact with family members because of the mood swings. While Royer has been in a prison ministry at church, he testified he has been unable to return because he feels overwhelmed around people.

Dr. Gerald Leglue, a physiatrist, has treated Royer from 2007 through the time of trial. He described Royer's injuries: a brain bleed in his frontal lobe which involves the incorporation of new memories, personality, and inhibitory reflexes on emotions; pulmonary contusion of the left lung, multiple left rib fractures, laceration to the spleen; and ascites (fluid in the abdomen free space). Royer suffered from post-traumatic encephalomalacia (atrophy of brain tissue). Dr. Leglue described that a person with a TBI can otherwise appear normal. He said Royer suffered from memory impairments, attention and concentration impairments, processing speed impairments, fine motor coordination impairments in both hands, weakness in verbal comprehension and verbal memory, difficulty organizing his activities, sleeping problems, suppressed appetite, limited social interaction, lack of motivation, limited interest, anxiety, depression and personality changes including short temper and irritability, which he said were "frankly predictable with the frontal lobe damage."

Dr. Leglue said that family counseling is a must, because the divorce rate following TBI is extremely high. He recommended attendant care for four to six hours per day because of safety issues; supervised physiotherapy at a medical wellness center once per month; case management; home management; housekeeping services; yearly laboratory testing; continuation of his current medication, which he had been taking for years; and visiting a physical medicine and rehabilitation doctor once per year for the rest of his life. Dr. Leglue further recommended vocational rehabilitation and a pain management program. Dr. Leglue opined that, from a physical standpoint, Royer could perform up to medium-duty work.

Dr. Shelly Savant, a neurologist and psychiatrist, is a clinical assistant professor at Tulane University and also runs a private medical practice that

20

involves the treatment of many people with brain injuries. Dr. Savant is also a certified life care planner. Dr. Savant's significant findings were that:

> Royer was dealing with a traumatic brain injury which evident to me on his imaging studies. Also I diagnosed him with a cognitive disorder not otherwise specified which is just a fancy way of saying he had difficulty with memory, executive functioning as well as language in relation to his traumatic brain injury. I felt that he had a personality change due to his traumatic brain injury. He has a left cranial nerve 4, tracheal uh, trochlear nerve palsy which means that he has a problem with his eye movements on the left side. Also he had some depressive symptoms which I felt best fit under the uh, umbrella of mood disorder due to a general medical condition. Lumbar disk disease, chronic pain, opioid use and I made uh, a list of two uh, types of injuries he'd sustained during his accident.[2] That is he had a splenic laceration as well as a pneumothorax and had to have a chest tube.

Dr. Savant further testified that Royer suffered from memory problems, attention problems, disinhibition (i.e. flies off the handle very quickly), physical and verbal aggression, and language problems. She testified that these problems are all consistent with a frontal lobe injury. Additionally, Dr. Savant testified that it increases Royer's risk of early onset Alzheimer's and dementia.

Dr. Savant then discussed Royer's ability to care for his children during the day while his wife works. She said that Royer's wife had set up structure to protect the kids (ages 2 and 4), such as only allowing Royer to microwave foods and checking up on him multiple times during the day.

Dr. Savant was questioned why this current plan is not sufficient since it has worked for Royer and his wife for the eight or nine years before trial. Dr. Savant replied:

> Well first of all you've got two young people who had a normal life and now they don't. Now you have one spouse with no injury. You have the other spouse who's brain injur[ed]. She has to work two jobs, she works six days a week. He can't put two and two together in terms of brain functioning to do the laundry, to do house cleaning. Like I said she's had to set up this structure to

---

[2] Dr. Savant noted that Royer is not abusing opioids; he is just prescribed them for his pain.

make sure the children are taken care of. He doesn't do meal prep. He cannot grocery shop. He can follow some lists if, if they have to go the grocery store, basically she goes and he follows her around. So they've gone this far but she's exhausted. I mean she's having pretty much to do everything. Uh, the bills are on auto pay for the most part. But if that structure wasn't there she'd be doing all of it because he can't do it. Cognitively from a thinking perspective he can't do it.

Dr. Savant then discussed various life care plans that included amounts for attendant care, case management, home management, and housekeeping. A worst-case scenario in which Royer no longer had his wife as a caregiver and developed Alzheimer's, resulted in a plan amounting to more than $19 million dollars. In the next plan, Dr. Savant assumed Royer's need for assisted living was deferred until he was in his sixties, but he received interval treatment for his TBI at a cost of $11 million. Dr. Savant then discussed a life care plan that assumed Royer and his wife would remain together and she would remain his primary caregiver with no respite. He would receive six hours of attendant care per day which would be $3.5 million. Dr. Savant then discussed future medical care and future support. Future support amounted to $2,836,376.48 and the amount for future medical care totaled $681,376.48.

Zoe Pikes Meeks, a CPA for thirty-eight years and a forensic accountant, testified that she performed an economic valuation of Royer's past and future lost wages. She determined that Royer's past lost wages amounted to $330,310.00. Future lost earning based on Royer's inability to work at all amounted to $949,449.00, and if he could return to work fifty percent of the time earning minimum wage his future loss of wages amounted to $763,131.00.

Samantha Royer, Tommy's wife, testified that, since the wreck, her husband is forgetful, short tempered, and cannot do any of the things he used to do before the accident, such as play on the church's softball team or be involved in the prison

ministry. She described a series of lists and schedules that keep Royer on track on a daily basis with regards to taking his medication and feeding his children. She said that her primary job is just a few minutes from home, so she is able to check on him when necessary. Samantha said that her mother used to help out, but, due to Royer's outbursts, she no longer does.

Dr. Glenn Hebert, a vocational expert and certified life care planner, testified that he reviewed all of the medical records to determine if Royer would be employable in the future. Dr. Hebert said that nothing in the record suggested that he could not work, and that with "queuing," or ways of reminding him to do certain things, such as cell phone apps, he could manage certain tasks. Prior to this injury, Royer did semi-skilled, medium-to-heavy-duty work. Thus, Dr. Hebert opined that Royer could learn by doing on the job with supervision and a lifting restriction of ten to fifty pounds per day. He said that Royer had a normal IQ and a lot of his memory was normal, although he had some deficits and was slow on processing some information. Dr. Hebert said he could perform jobs such as being a janitor, a box packer, donation inspector at Goodwill, or the like. Dr. Hebert opined that he could earn between $7.45 to $10.00 dollars per hour and could work full-time.

Dr. Hebert testified that Dr. Savant's life care plan did not follow the guidelines set forth by the International Association of Life Care Planners. He said she did not consult with all of the specialists, nor did the medical records support her conclusions. Dr. Hebert opined that no records supported Dr. Savant's testimony that Royer needed to attend TBI facilities on a yearly basis. He further stated that Royer did not need to attend a residential brain injury program. He felt that $15,000.00 per year for an accountant was an exorbitant cost. He further said that financial management costs of $700,000.00 per year should not have been included in a life care plan, because the money for future medical care is put in a

23

trust account and the bank provides trust officers to administer it. He additionally saw no need for an interdiction at a cost of $10,000 per year. Dr. Hebert's biggest criticism of Dr. Savant's plan was that he did not know where she came up with the figures she used. Dr. Hebert opined that if Royer could clean house, babysit, cook, play golf, ride a four-wheeler, and go hunting, he could work.

On the other hand, Dr. Hebert opined that costs for medical services such as MRIs, CT scans, x-rays, physical therapy and rehabilitation, prescription medications, and psychotherapy would be necessary expenditures. He determined that Royer's life care plan would amount to $506,674.48 over the course of his lifetime.

On cross examination, Dr. Hebert admitted that he did not call to see if any of these jobs were available, but he said that jobs of this sort have high turnover rates and are always available. He felt that work would be therapeutic to Royer, and that if he could take care of his two children every day, he was capable of performing work outside the home. However, he had no personal knowledge of how the Royers operated on a day-to-day basis.

Dan Cliffe, a CPA for thirty-four years, testified regarding potential economic losses Royer suffered as a result of the accident based on the figures provided by Meeks. He calculated Royer's past loss wages to be $260,975.00 and future lost wages, if he never returned to work of anywhere, from $602,270.00 to a high of $777,335.00. If Royer could return to work part time at twenty hours per week, the low value would be $441,625.00 and the high would be $505,970.

Regarding the amounts that Dr. Hebert testified to, Cliffe came up with a present value future life career plan cost of $441,023.00. That amount increased to $480,023.00 with home management added and $650,204.00 with home keeping.

Dr. Teresa Spencer, a neuropsychologist, was qualified as an expert in the rehabilitation of patients with TBI and was hired by the state to perform an evaluation of Royer's brain function by measuring his cognitive and emotional skills. She believed that he sustained a moderate brain injury as a result of the August 2006 crash that caused cognitive impairments and weaknesses, emotional problems, and neurobehavioral dysfunctions. Royer was seen in 2007 and 2009. In 2007, he displayed average intellectual ability. In 2009, his intellectual functioning remained in the average range, but his visual special abilities improved while his verbal abilities stayed in the average range. Dr. Spencer determined that Royer had average intellectual functioning before the accident as well. However, he did suffer from some behavioral changes that were limiting him from doing more such as low motivation and difficulty with anger control. In 2009, it was recommended that Royer have assistance with his medical, financial, and dispositional affairs but a guardian was not needed. Royer also underwent testing to make sure he could safely drive, which he passed. In June 2014, it was noted that he applied for Social Security disability benefits but was denied. Dr. Spencer noted weaknesses on tests involving sustained and divided attention, mild to moderate impairment of his processing speed, and delayed memory. Dr. Spencer concluded that, overall, Royer had mild to moderate impairment of his cognitive abilities.

Dr. Spencer opined that Royer did not need inpatient rehabilitation as he was functioning in his home. She recommended continuing psychotherapy and medication management, because Royer's depression was worsening. Dr. Spencer further opined that medication management and psychotherapy was warranted for his lowered motivation and poor anger control. She said he would need accommodations in a workplace as far as cognitive ability for the deficits he

experienced. She further said a case manager to help maintain employment would be helpful. Dr. Spencer did not believe that Royer needed attendant care for four to six hours, seven days a week, since he has been able to live independently since a year removed from the accident. She did not feel that he needed any level of supervision.

Thus, were we to provide a review of the damage award pursuant to the agreed upon jury verdict form, we would find no error in it. Accordingly, this assignment of error is without merit.

### Trial Court's Judgment

In assignment of error number three, DOTD argues that the trial court's judgment failed to incorporate the mandatory language set forth in La.R.S. 13:5106 regarding future medical expenses to be paid through the Future Medical Care Fund (FMCF). Louisiana Revised Statutes 13:5106(B)(3)(c) (emphasis added) states in part:

> In any suit for personal injury against the state or a state agency wherein the court pursuant to judgment determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, *the court shall order* that all medical care and related benefits incurred subsequent to judgment be paid from the Future Medical Care Fund as provided in R.S. 39:1533.2. Medical care and related benefits shall be paid directly to the provider as they are incurred.

The trial court's judgment is silent as to the payments to be made from the FMCF. Accordingly, the trial court is instructed to amend its judgment to include an order instructing the precise amount to be paid from the FMCF pursuant to La.R.S. 13:5106(B)(3)(c).

### Future Medical Care Fund-Interest

In assignment of error number four, DOTD argues that the trial court erred in signing the jury's verdict, which awarded legal and judicial interest on future

26

medical care expenses that are to be paid from the FMCF.[3] The trial court's judgment stated:

> IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of THOMAS C. ROYER against THE STATE OF LOUISIANA THROUGH THE DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT in the sum of THREE MILLION, SEVEN HUNDRED SIXTY-SIX THOUSAND, NINE HUNDRED TWENTY-TWO DOLLARS AND NINETY-SEVEN CENTS ($3,766,922.97) plus (1) legal interest thereon pursuant to La.R.S. 13:5112(C) from July 9, 2007 (which is the date service was requested following judicial demand) at the rate of 6% annum until the date this Judgment is singed, and plus (2) legal interest accruing subsequent to the signing of this Judgment at the rate fixed by La.R.S. 9:3500.

The supreme court recently addressed this res novo issue in *Fecke v. Bd. of Supervisors of Louisiana State University*, 15-1806 (La. 9/23/16), __ So.3d __.[4] The supreme court thoroughly discussed the legislative history and purpose behind the FMCF and found in pertinent part that:

> [W]e find that the legislature did not intend for interest to be paid from the date of demand on judgment amounts which the statute specifies are to be paid to the health care provider as they are incurred. Moreover, it would make little sense for the legislature to provide that an award for future medical care must be paid into the FMCF, yet allow judicial interest on that award to be paid directly to the claimant. The FMCF statute provides that "[i]nterest earned on investment of monies in the fund shall be deposited in and credited to the fund." La. Rev. Stat. 39:1533.2(B). Admittedly, this language refers to investment income rather than judicial interest; nonetheless it suggests the legislature intended to keep all money derived from the future medical care award in the fund. We believe our interpretation is consistent with the overall purpose of the Act as set forth in La. Rev. Stat. 13:5106(E).
>
> Although the Feckes argue this case is distinguishable from *Hall* [*v. Brookshire Brothers*, 02-2404 (La. 6/27/03), 848 So.2d 559] because the PCF is funded from private monies, we believe the purpose of the legislation underlying each fund is quite similar. The Medical Malpractice Act, adopted in response to the

---

[3] The parties' arguments in brief rely on cases before the rendering of *Fecke* by the supreme court. As these same arguments are addressed in *Fecke*, we will not repeat them, as the supreme court's ruling makes clear that interest will not be allowed.

[4] This case may be found at 2016 WL 5390302.

increasingly prohibitive costs of medical malpractice insurance, sought to ensure the availability of safe and affordable health care services to the public and to simultaneously limit the significant liability exposure of health care providers. *Hall*, 02–2404 at 9–10, 848 So.2d at 565 (citation omitted). On the other hand, the Act, enacted in response to the increased number of judgments against the state as a result of the proscription of sovereign immunity, sought to curb governmental liability abuses, to balance an individual's claim against the needs of the public interests and the common good of the whole society, and to avoid overburdening Louisiana's economy and its citizens with new and/or increased taxes. In both cases, the legislature sought to provide for the needs of the tort victim claimant while simultaneously protecting the public's interest, either directly (the FMCF preserves public funds) or indirectly (the PCF limits the liability of health care providers generally, helping make health care costs more affordable for all).

. . . . The Legislature exercised its constitutional authority in amending La. Rev. 13:5106 (B)(3) to establish the FMCF, and if it had intended to allow a claimant to recover interest on a future medical care award placed into the FMCF, then it would have provided such, but it did not.

*Id*. at ____.

Thus, there is no doubt that a plaintiff cannot receive interest on an award for future medical care to be placed in the FMCF. Accordingly, that portion of the trial court's judgment awarding such interest is hereby reversed, and the matter is remanded for an adjustment of the amount due Royer from DOTD.

## CONCLUSION

The trial court's judgment pertaining to DOTD's liability, the application of the collateral source rule, and the jury's damages awards is affirmed. The trial court's judgment pertaining to the award of legal and judicial interest on future medical care expenses to be placed in the FMCF is hereby reversed. The trial court is instructed to amend its judgment to include the specific amount of future medical expenses to be paid from the FMCF and to eliminate judicial interest on

the funds placed in the FMCF. Costs of this appeal are assessed to the defendant-appellant, the State of Louisiana, through the Department of Transportation and Development, in the amount of $17,261.35.

**AFFIRMED IN PART; REVERSED IN PART;**

**REMANDED WITH INSTRUCTIONS.**